*In re* MARRIAGE OF MARGARET M. ZWART, Petitioner-Appellant, and MARTEN ZWART, Respondent-Appellee.

Second District   No. 2—92—0778

Opinion filed May 28, 1993.

James M. Allen, of Palatine, for appellant.

Michael C. Poper, Thomas M. Foley, and Stephen M. Haugh, all of Michael C. Poper, P.C., of Crystal Lake, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Petitioner, Margaret M. Zwart, appeals the judgment of the circuit court which dissolved the marriage of petitioner and respondent, Marten Zwart. Petitioner challenges the property distribution as inequitable.

The parties were married on December 16, 1990. Petitioner filed for dissolution of the marriage on August 20, 1991. At the time of the dissolution, in July 1992, respondent was 53 years old and petitioner was 35 years old. Petitioner had three children from a former marriage who lived with the parties in the marital home. In her petition, petitioner alleged that she was employed as a legal secretary.

According to an affidavit filed on March 12, 1992, respondent stated that he was unemployed. His total living expenses were $2,755.48 per month, and his sole debt was the mortgage on the marital home. Respondent had no income. His assets were $2,500 in a savings account in Barrington and $1,600 in a Swiss bank account.

On April 29, 1992, the court entered an agreed order of stipulation. According to the order, the parties stipulated that the purchase price of the marital residence was $240,000; respondent paid $60,000 plus costs of $5,760.76 to purchase the property; petitioner owned a house as nonmarital property (Palatine house); both parties were in title as joint tenants for the marital home and both signed the mortgage; petitioner would assume responsibility for all credit card debts in her name; petitioner made no claim to any property respondent owned or purchased prior to the marriage; respondent made no claim to the diamond rings he gave petitioner; petitioner received $1,030

from respondent and she signed a promissory note acknowledging the debt; and prior to the marriage petitioner received from respondent $8,748.34 to purchase a car and $2,884 to repair the roof of the Palatine house. The parties did not stipulate that these latter sums were a gift or a loan.

At the hearing, petitioner testified that she had custody of three children from a prior marriage, and she received $115 per week in child support from her former husband. Petitioner estimated that the Palatine house was worth $70,000. It was vacant because it was in need of repair. There were no loans or mortgages against the Palatine house. Petitioner brought no furniture to the marital home, and respondent bought bedroom sets for two of petitioner's children.

When the parties met in 1988, petitioner's financial condition was poor. She was working part-time and earning between $140 and $160 per week. Because petitioner was driving a rusty car, respondent took her to buy a new car. Respondent paid for the car because, according to petitioner, respondent wanted to give it to her. Petitioner offered to pay respondent back for the car if she sold the Palatine house.

In November 1989, after they broke off their relationship, petitioner asked respondent for a loan to fix the roof on the Palatine house. Respondent wrote her a letter advising her to come get the money. Instead, petitioner got a loan from her credit union. After they reconciled, respondent paid off the loan and all of petitioner's other bills.

The parties got engaged in October 1990. They discussed petitioner selling the Palatine house and putting the proceeds into the marital home; however, petitioner did not sell the house. At that time, petitioner secured full-time employment and was making $16,000 per year, gross. Petitioner signed the $180,000 mortgage for the marital home, although she did not make any of the payments. During the marriage, petitioner paid for groceries, her children's needs, her own needs and expenses for the Palatine house. The promissory note was for money to repair the Palatine house. The house had been in need of repair to make it salable, and the taxes were delinquent. Before the marriage, petitioner spent $520 per month for groceries, and during the marriage petitioner spent $640 per month. During the marriage, petitioner did the cleaning, the cooking and the laundry.

After petitioner filed for dissolution, respondent asked her to disclaim any interest in the marital home. She refused. At the time of the hearing, petitioner was making $20,000 per year. Petitioner testified that a realtor estimated that the listing price for the marital home should be $289,000.

Testifying as an adverse witness, respondent stated that he was a citizen of the Netherlands. He had been a part owner of a European corporation, Contiweb. In 1983, that company was bought out by another corporation and became Stork Contiweb. Respondent received fl100,000 (Dutch guilders) from the sale of Contiweb, which respondent estimated as $56,000 or $59,000. Respondent worked for that corporation in the United States on a limited work visa. Respondent was the vice-president of marketing for Stork Contiweb, making $87,000, when his employment was terminated in July 1989. He received severance pay until the end of January 1990. The visa respondent had did not allow him to work for any company in the United States other than Stork Contiweb.

According to respondent, when he met petitioner, the car she was driving was unsafe. He thought she should get a new car, but she said she could not afford to do so. Respondent told her he would take care of it, so he wrote a check to the car dealership for the car. Later, petitioner said she would repay him when she sold the Palatine house.

Respondent testified that he purchased the marital home because they needed a large house to accommodate petitioner's children. In January 1991, the parties closed on the sale of the marital residence. Respondent put petitioner's name on the deed to the home because petitioner promised to sell the Palatine house and apply the proceeds to the new house. Respondent expected that to result in lower mortgage payments. He purchased all of the furniture for the marital home. Respondent made the down payment for the home and paid for the furniture by transferring funds from European bank accounts into his local account. During the marriage, respondent paid for everything for the house and paid petitioner's car insurance. He also bought $250 worth of groceries each week. In July 1991, respondent told petitioner he wanted a joint account with her. In September 1991, she executed the promissory note. Respondent admitted that he asked petitioner to disclaim any ownership interest in the marital residence after petitioner filed for dissolution.

On his 1990 income tax return, respondent reported an income of approximately $11,000. At the time of the hearing, in addition to the bank account in Barrington and the account in Switzerland, respondent had an account in the Netherlands into which his father deposited money. Respondent deposited over $150,000 in the Barrington account in 1990; from January through October 1991, he deposited $66,000. The current balance in his Barrington account was $5,000. Respondent also admitted that he gave petitioner over $29,000 prior to the marriage.

Testifying in his own behalf, respondent explained that the money for the car was a loan, and they discussed that at the dealership. In the summer of 1990, during one of their break-ups, respondent asked petitioner for an IOU for the car loan. Respondent also testified that he paid off petitioner's loan to the credit union because she showed him that she had to pay interest on the loan and she was behind in the payments. Respondent told her that the money to pay off the credit union was a loan, but she would not owe him interest on it. Respondent "bailed out" petitioner several times because she was not good at managing her finances.

When respondent was in the process of purchasing the marital home, petitioner told him he would have trouble getting a mortgage because he was unemployed and was not a permanent resident of the United States. Respondent got the money for the down payment from the Dutch account. Respondent explained that his father deposited money into that account under a Dutch tax law. His father had use of the account and received all the interest. Respondent would not have use of the account until his father's death. Respondent's father transferred money from the Dutch account to the Swiss account. Respondent also used those funds for living expenses.

Respondent submitted a list of all the personal property purchased for the marital home. Most of the items were purchased before the marriage. Respondent paid $9,000 to $10,000 for the new furniture. Respondent stated that he paid $3,000 for the installation of a deck on the marital home, $900 for doors, $1,000 for a central humidifier and an electronic air cleaner, and $2,000 for window blinds. Between January and October 1991, respondent paid $28,000 for the mortgage, taxes and insurance on the marital home. According to respondent, one realtor's market analysis suggested a listing price of $253,000 for the home, and another estimated $280,000 or $260,000 for the listing price. The house needed interior and exterior painting and carpet cleaning, which respondent estimated to cost $5,200. The mortgage balance on the home as of December 1991 was $179,831.36, and the annual taxes were $5,424.10. Respondent stated that he wanted to give the bedroom furniture he bought for petitioner's children to them. Respondent indicated that he had to leave the United States because his visa was about to expire.

In the judgment, in addition to the stipulations, the court found that petitioner did not owe respondent anything for money transferred to her prior to the marriage; the marital home was marital property and respondent failed to overcome the presumption of a gift to the marriage; the two bedroom sets given to petitioner's children

were gifts to the children; neither party requested permanent maintenance, although respondent requested temporary maintenance; and respondent made the down payment of $60,000 plus costs, made capital improvements, and testified that the house needed repairs of approximately $5,000 to prepare it for sale. The court stated that it based its property distribution decision on the contribution each party made to the marital estate, the value of the property given to each spouse, "the very short length of the marriage having been only approximately eight months" when petitioner filed for dissolution, what each party put into the marriage and the totality of the circumstances.

The court ordered: (1) both parties were forever barred from maintenance; (2) two of the children were to retain the bedroom furniture given them by respondent; (3) petitioner was allowed to live in the marital home until 45 days after the end of the school year; (4) beginning two weeks after the end of the school year, petitioner would pay rent of four-fifths of the principal and interest of the mortgage until she vacated the house; (5) petitioner received the Palatine house free and clear from any claim by respondent; (6) petitioner would receive from proceeds of the sale of the marital residence $7,500 less the $1,030 petitioner owed respondent; (7) respondent received all the property in the marital residence except for the kitchen table and chairs and a few minor items; and (8) each party would pay his or her own attorney fees. Petitioner timely appealed.

Petitioner contends that the court abused its discretion in distributing the marital property and that the cause should be remanded for a new property distribution.

■ Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) allows the trial court discretion to divide the marital property in just proportions, considering all relevant factors, including statutory factors. (Ill. Rev. Stat. 1991, ch. 40, par. 503(d); *In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, 37.) A division of property need not be mathematically equal to be equitable. (*In re Marriage of Tietz* (1992), 238 Ill. App. 3d 965, 979.) We will not reverse such an order unless the court abused its discretion. (*In re Marriage of Eidson* (1992), 235 Ill. App. 3d 907, 911.) A court has abused its discretion only when no reasonable person could take the view adopted by the trial court. *Eidson*, 235 Ill. App. 3d at 911.

■ The sole asset of the marital estate was the marital home. The evidence shows that respondent was the sole source of funds for the purchase of the home and for the payments and improvements for the home. Although petitioner asserts that the fair-market value of

the house is $280,000, the trial court did not make any finding in that regard, nor was any evidence presented of the value of the house. No appraisal was done on the house; the evidence related only to the listing price. Thus, we cannot speculate as to the value of the house. The evidence showed that there was an outstanding mortgage balance of over $179,000, the annual taxes were over $5,000, the suggested listing price for the house ranged from $253,000 to $289,000, and the realtor would take a 5% commission.

Petitioner argues that the award of $7,500 (less $1,030) was substantially disproportionate to the amount of money available to distribute from the equity in the marital residence. However, as noted above, there was no evidence from which the court could determine the amount of equity in the marital home. The parties purchased the home in 1991 for $240,000, and there was no evidence of how much the value of the home increased in 1½ years. The trial court may have concluded that the equity in the home increased by a minimal amount, if at all.

Petitioner next argues that the court erred in distributing the property because it did not apply properly the statutory factors and there were no unusual circumstances to warrant a substantial distribution to respondent.

The following factors from section 503(d) of the Act apply here:

"(1) the contribution or dissipation of each party in the acquisition, preservation, or depreciation or appreciation in value, of the marital and non-marital property, including the contribution of a spouse as a homemaker or to the family unit;

(2) the value of the property set apart to each spouse;

(3) the duration of the marriage;

(4) the relevant economic circumstances of each spouse when the division of property is to become effective ***;

* * *

(7) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties;

* * *

(10) the reasonable opportunity of each spouse for future acquisition of capital assets and income." (Ill. Rev. Stat. 1991, ch. 40, par. 503(d).)

The evidence shows that respondent made the entire contribution to the acquisition, preservation and appreciation in value of the marital home. Petitioner argues that the trial court placed too much emphasis on this factor. We disagree.

The record shows that the court considered all of the relevant factors. The court emphasized the very short duration of the marriage. We reject petitioner's assertion that she should be given credit for her contributions as a homemaker. This factor has little relevance when the spouse claiming homemaking contributions worked outside the home during the marriage. (See *In re Marriage of Tatham* (1988), 173 Ill. App. 3d 1072, 1085; see also *In re Marriage of Philips* (1990), 200 Ill. App. 3d 395, 405.) Petitioner was employed throughout the marriage, while respondent was not. In addition, it is when the marriage is long term that the source of the assets becomes less of a factor and the spouse's role as the homemaker becomes greater. (*In re Marriage of Scoville* (1992), 233 Ill. App. 3d 746, 758.) The marriage was of such short duration that this factor has little, if any, weight. See *In re Marriage of Cecil* (1990), 202 Ill. App. 3d 783, 790-91.

The other factors support the court's determination. At the time of the hearing, petitioner was 35 years old, was employed full-time as a legal secretary and was earning $20,000 per year. She owned a home worth approximately $70,000, which was unencumbered. She received $115 per week in child support. Respondent, by contrast, was 53 years old and unemployed. He cannot work in this country and must return to the Netherlands. He had no income and depleted most of his liquid assets in purchasing and maintaining the marital home and the furniture in it. At the time of the hearing, respondent had less than $5,000 in his bank account in Barrington. We cannot consider the Dutch bank account as an asset of respondent because, as he testified, the money in that account actually belongs to his father, and he has no access to that account until his father dies. There was no evidence of the value of that account, nor can it be assumed that respondent's father will continue to contribute to that account. We conclude that the court's determination of the property distribution award was not an abuse of discretion.

The judgment of the circuit court is affirmed.

Affirmed.

UNVERZAGT and COLWELL, JJ., concur.