In re MARRIAGE OF MARILYN S. MARRIOTT, Petitioner-Appellant and Cross-Appellee, and ROBERT F. MARRIOTT, Respondent-Appellee and Cross-Appellant.

Second District   No. 2—93—0297

Opinion filed June 29, 1994.

Barbara G. Vella, of Vella, Sparkman & Altamore, P.C., of Rockford, for appellant.

Ann M. Dittmar and Daniel T. Williams, Jr., both of McGreevy, Johnson & Williams, P.C., of Rockford, for appellee.

JUSTICE QUETSCH delivered the opinion of the court:

Petitioner, Marilyn S. Marriott, brought this action in the circuit court of Winnebago County seeking the dissolution of her marriage to respondent, Robert F. Marriott. On September 17, 1992, the trial court entered a judgment of dissolution of marriage. Marilyn appeals and Robert cross-appeals from that judgment. On appeal, Marilyn argues that the trial court erred in its distribution of marital assets and erred in treating a payment to her during the pendency of the proceedings pursuant to an agreed order as an advance of her share of marital property. In his cross-appeal, Robert argues that the trial court erred in classifying certain assets as marital property. Robert also argues that the trial court erred in reserving jurisdiction to award maintenance for a period of six years and in ordering him to report periodically on his financial status during the period of reserved jurisdiction.

Robert and Marilyn were married in January 1977. It was the second marriage for both parties, and both were in their early fifties at the time of the dissolution proceedings. Robert and Marilyn had no children together, but Robert has a son, Robert, Jr., and a daughter, Martha, from his first marriage. During certain periods of the marriage Robert's children, who were then in their teens, resided with the couple.

Robert is a high school graduate and was employed by Barnes Drill Co. (Barnes Drill) for 22 years concluding in 1980. Prior to 1980,

members of Robert's family were Barnes Drill's principal shareholders, and Robert ceased to be employed by Barnes Drill when his family disposed of its interest in the corporation. The last position Robert held with Barnes Drill was "sales engineer." During the rest of the marriage, Robert held a number of jobs principally involving sales or telemarketing activities. At times, Robert experienced long periods of unemployment, and he described his employment history during the marriage as "spotty." During the later stages of the dissolution proceedings, Robert was working 40 to 45 hours a week in a temporary position at a wage of $4.25 per hour.

At the time of the marriage, Marilyn was employed by Barnes Drill as an industrial nurse, and she continued to work in that position during the first year of the marriage. According to her testimony, Marilyn held three other nursing positions during the marriage. She was employed by Rockford Memorial Hospital from 1980 to 1982. In 1986 and 1987, she was employed by Foster Infusion Care. In 1990, shortly before filing the petition for dissolution, Marilyn obtained a part-time position at Oakwood Hospital. During the marriage, Marilyn also took nursing courses at Rockford Memorial Hospital and Rockford College. When she was employed, Marilyn deposited her earnings in a checking account maintained in her name individually. She used her earnings to buy groceries occasionally and to buy gifts for members of her family and Robert's family.

Marilyn also assumed certain parental responsibilities with respect to Robert's children from his first marriage. Robert, Jr., moved in with the couple in 1984 or 1985, at which time he was in the eighth grade. After completing the ninth grade, Robert, Jr., attended a military school in Wisconsin, and after completing high school in 1988, he moved back in with Robert and Marilyn for about a year. Robert's daughter, Martha, moved in with the couple in the spring of 1987. She was 16 years old at the time. The record reflects some confusion about whether Martha attended a private boarding school in Michigan during the 1987-88 school year or attended school locally. However, the following year (Martha's senior year in high school), she attended a local school and resided with Marilyn and Robert. When the children were living with the couple, Marilyn attended to transportation of the children to school and extracurricular activities, parent-teacher conferences, and the children's other needs. Marilyn also visited Robert, Jr., at military school and attended school functions. Sometimes Robert accompanied her, and on other occasions Marilyn went by herself.

At the time of the dissolution proceedings, Marilyn suffered from severe respiratory or pulmonary ailments, including asthma, emphy-

sema, and bronchitis. The testimony of Marilyn's physician, Dr. Phil Zimmerman, was presented in the form of an evidence deposition. Dr. Zimmerman indicated smoking was a major cause of Marilyn's respiratory problems. Dr. Zimmerman indicated that Marilyn's condition limited her occupational prospects to sedentary work or employment involving light physical activity. He testified that her condition would probably require absences from the workplace, diminishing her prospects for maintaining full-time employment. Marilyn expressed the opinion, based on her familiarity with the nursing employment market, that her medical condition would prevent her from securing full-time employment as a nurse.

The property distribution issues raised on appeal and cross-appeal relate to two assets found by the trial court to be marital property: the marital residence located at 5328 East Drive in Loves Park and the proceeds from the liquidation of a Van Kampen Merritt mutual fund (the VKM fund). Prior to the marriage, the property at 5328 East Drive was owned by Robert's parents, Roger and Jeanne Marriott. On May 27, 1976, approximately eight months prior to the marriage, Roger and Jeanne conveyed the property into a land trust pursuant to which they were cotrustees and beneficiaries. The same day, however, Jeanne and Roger assigned the entire beneficial interest to Robert. At about this time Robert moved into the house. In 1982, at Robert's direction in accordance with the terms of the trust agreement, Robert's parents delivered a trustee's warranty deed conveying the property to Marilyn and Robert as joint tenants. The VKM fund was purchased during the marriage and was held by Robert and Marilyn in joint tenancy. The money invested in the VKM fund represented the proceeds received by Robert in 1980 from the disposition of common stock in Barnes Drill which Robert had acquired before the marriage or had inherited or acquired as a gift. The proceeds from the disposition of the Barnes Drill stock were originally invested in other securities, but it appears to be undisputed that the proceeds are directly traceable to the VKM fund.

Robert testified that he placed both the marital residence and the VKM fund in joint tenancy with Marilyn because she had stated that she wanted to have property placed "in her name." According to Robert, by placing the assets in joint tenancy, it was his intent to provide "temporary satisfaction" to Marilyn; he did not intend to make a gift of the assets. With respect to the marital residence, Marilyn expressed her desire to have partial ownership during several conversations with Robert. According to Robert, Marilyn was "tenacious," "aggressive," and "insistent" during these conversations. Robert admitted that he never indicated to Marilyn that he intended the transfer only to be temporary.

Robert testified that in 1987 he decided that he had made a mistake by placing the VKM fund in joint tenancy. Robert had become concerned because Marilyn had stated that if she had access to the money invested in the fund she would spend it all. In addition, Robert sought to use the VKM fund as collateral for a loan in connection with an investment opportunity, and he apparently did not want the transaction to hinge upon Marilyn's consent or her willingness to sign the loan and security documents. The record contains a copy of a letter to Marilyn from Robert's attorney, Steven Sproul, requesting Marilyn to sign two enclosed blank stock powers. The letter further stated, "I am attempting to clear up some confusion over this Van Kampen Merritt account and accordingly I need these powers executed at your earliest convenience." The record also contains a printed stock power form bearing what appears to be Marilyn's signature, but otherwise left blank. Robert admitted that these documents were an attempt to trick Marilyn into transferring her interest in the VKM fund to him. Marilyn denied signing the stock power, although she testified that the signature on the stock power appeared to be hers. She also denied receiving the letter from Sproul.

During the marriage, Robert received gifts from his parents and grandmother in the total amount of $30,000 annually. Robert deposited the money into a savings account established prior to the marriage. Robert and Marilyn also maintained a joint bank account during the marriage. Property taxes on the marital residence were paid with checks drawn on this account. However, Robert transferred funds to the joint account from his premarital savings account to cover the tax payments. The marital residence was redecorated in 1981 at Robert's expense. At some point, a gazebo was built on the property at a cost of $7,000. Marilyn financed the construction of the gazebo with an interest-free loan to Robert which Robert later repaid.

Marilyn filed her petition for dissolution of marriage on May 14, 1990. The same day she filed a petition for temporary relief, requesting, among other things, that she be awarded sole and exclusive possession of the marital residence during the pendency of the case. Robert subsequently filed a cross-petition seeking similar relief in his favor. On August 13, 1990, an agreed order was entered pursuant to which Robert was granted occupancy of the marital residence and Marilyn was ordered to vacate the premises. In turn, the agreed order provided that Marilyn was to receive a payment of $7,500 and weekly temporary maintenance payments of $250. In presenting the agreed order to the trial court, Robert's attorney stated that "the $7,500 is not intended by the parties to be maintenance but

the distribution to Mrs. Marriott of cash advance." However, Robert's attorney also indicated that it was his understanding that "the issue of credit against the ultimate settlement is reserved by the Court for future determination in the trial of this case." The agreed order itself provided that "[t]he Court reserves jurisdiction to determine whether or not the $7,500.00 shall be taken from the marital estate as opposed to the non-marital estate of [Robert] *or as to whether or not [Marilyn] must account for said monies in the final distribution of the parties' assets.*" (Emphasis added.) In connection with the agreed order, the VKM fund was liquidated and $7,500 from the proceeds was distributed to Marilyn.

On October 31, 1990, Robert filed a petition seeking to reduce his temporary maintenance obligation pursuant to the agreed order. Robert represented that he had agreed to pay the $250 weekly maintenance payments based on his understanding that the case would proceed quickly to trial. Robert contended, in essence, that he lacked the financial resources to make the weekly payments on a long-term basis. An evidentiary hearing was held on November 29, 1990, and on December 31 the trial court entered an order terminating the $250 weekly temporary maintenance on the basis of a substantial change in the circumstances of the parties.

The trial court entered its judgment of dissolution on September 17, 1992. Following post-trial motions the judgment of dissolution was modified on February 4, 1993. The trial court determined that both the marital residence and the VKM fund were marital property. The court found that Robert had failed to overcome the presumption that these assets were a gift to the marital estate. The court concluded, however, that Robert was entitled to a two-thirds share of the marital residence based on his greater contribution to the acquisition and preservation of the asset. The court placed a value of $60,000 on the marital residence and awarded the residence to Robert subject to an offsetting payment of $20,000 to Marilyn for her one-third share of the property.

At the time of the judgment of dissolution, the proceeds of the VKM fund remaining after the previous distribution of $7,500 to Marilyn pursuant to the agreed temporary order totalled approximately $65,000. The trial court found that the $7,500 distribution was "a predistribution of marital assets." In substance, the trial court divided the VKM fund equally on the basis of its value *before* the $7,500 "predistribution" to Marilyn (*i.e.*, $72,500). Thus, subject to further adjustment, each party's share of the VKM fund was $36,250. The $7,500 "predistribution" to Marilyn was credited to the $20,000 representing Marilyn's one-third share of the marital resi-

dence and the balance of $12,500 owed for Marilyn's share of the marital residence was paid to Marilyn by an adjustment of the party's respective shares of the VKM fund. Accordingly, the $65,000 balance of the VKM fund proceeds was awarded as follows: $48,750 ($36,250 + $20,000 − $7,500) to Marilyn and $16,250 ($36,500 − $20,000) to Robert.

The trial court found that Marilyn was eligible for maintenance due to the impact of her medical condition on her prospects for employment but found that Robert was then unable to pay maintenance and still meet his reasonable needs. The court reserved maintenance for a period of six years and ordered Robert to report on the status of his income on an annual basis and to report gifts worth more than $1,000 as received.

Marilyn first argues that the trial court erred in awarding Robert two-thirds of the value of the marital residence. Marilyn contends that the trial court erred in finding that Robert made a greater contribution to the acquisition and preservation of the marital residence. Marilyn also contends that the trial court ignored or ascribed insufficient weight to her substantial nonmonetary contribution as a homemaker.

Section 503(d) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(d) (West 1992)) provides that marital property shall be divided in "just proportions" upon consideration of "all relevant factors," including various factors specifically enumerated in the Act. Among those factors is "the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including the contribution of a spouse as a homemaker or to the family unit." (750 ILCS 5/503(d)(1) (West 1992).) The division of marital property in "just proportions" does not mean that the property must be divided in mathematical equality, and an unequal division may be made where the court has properly applied the statute. (*In re Marriage of Drone* (1991), 217 Ill. App. 3d 758, 764.) The trial court's distribution of property rests within its sound discretion and will not be disturbed on appeal absent an abuse of that discretion. (*In re Marriage of Clabault* (1993), 249 Ill. App. 3d 641, 648.) Such an abuse of discretion occurs only where no reasonable person would take the view adopted by the trial court. *Clabault*, 249 Ill. App. 3d at 648.

Marilyn initially contends that Robert did not contribute to the acquisition of the marital residence. We disagree. Marilyn acknowledges that prior to the marriage the marital residence was held in a land trust with Robert as the sole beneficiary and Robert's parents as trustees. Even so, Marilyn contends that the conveyance of the prop-

erty to Robert and Marilyn as joint tenants was a gift to the couple from Robert's parents. Marilyn argues that Robert had no "legal interest or ownership interest in the realty" prior to the marriage. She cites the well-established principle that, with regard to a land trust, the trustee holds both legal and equitable title, while the beneficiary's interest in the trust is personal property. *E.g.*, *Klein v. La Salle National Bank* (1993), 155 Ill. 2d 201, 207; *Klebe v. Patel* (1993), 247 Ill. App. 3d 474, 478.

While Marilyn is, of course, correct in her recitation of this general principle, the principle operates within a limited domain. Our supreme court has stated:

"[T]hough referred to as personal property, most of the usual attributes of real property ownership are retained by the beneficiary under the trust agreement. In fact, the only attribute of ownership ascribed to the trustee is that relating to title, upon which third parties may rely in transactions where title to the real estate is of primary importance. ***

*** Ownership has been imputed to the land trust trustee in *** instances where title is the primary concern. [Citation.] The trustee may, of course, on direction, represent the property, but where the primary issue involves ownership rather than title [citation], reliance on bare legal title would be inappropriate.

The term 'owner,' as applied to land, has no fixed meaning applicable under all circumstances and as to any and every enactment. [Citation.] *** Title to property does not necessarily involve ownership of the property. Title refers only to a legal relationship to the land, while ownership is comparable to control and denotes an interest in the real estate other than that of holding title thereto." *People v. Chicago Title & Trust Co.* (1979), 75 Ill. 2d 479, 488.

Accord *Klebe v. Patel* (1993), 247 Ill. App. 3d 474, 478 ("this court recognized that the land trust beneficiary is the true owner of the property for many purposes"); see also Freyfogle, *Land Trusts and the Decline of Mortgage Law*, 1988 U. Ill. L. Rev. 67, 74-75 (discussing various situations where "courts look beyond the [land trust] transaction's form to identify the party having the normal incidents of possession and control that are the primary indicia of ownership").

■ In the setting of a dissolution of marriage proceeding, where the inquiry pertains to a spouse's contribution to the acquisition of marital property, title is not of primary importance. Rather it is the attributes of the beneficiary's interest—the power: (1) to possess, manage and physically control the real estate; (2) to receive all income generated by the property; (3) to direct the trustee in dealing with title to the real estate; and (4) to receive the proceeds of any

sale of the property made pursuant to the power of direction (*Patrick v. Village Management* (1984), 129 Ill. App. 3d 936, 939)—that are most significant in determining ownership in this context. Accordingly, as the owner of the entire beneficial interest in the land trust prior to the marriage, Robert was the "owner" of the property for purposes of determining contributions to the marital estate, and the trial court did not err in concluding that Robert made a greater contribution to the acquisition of the marital residence.

■ Marilyn next argues that the trial court was mistaken in its view that Robert contributed to the preservation of the marital residence. The trial court found that Robert paid the majority of the mortgage and other debts of the property. Marilyn contends that there was no mortgage encumbering the property. The "other debts" mentioned by the trial court would appear to be a reference to payment of real estate taxes. It is undisputed that the taxes were paid with checks drawn on a marital joint account, but that Robert transferred funds to cover the tax payments from an individual, nonmarital account into the marital joint account. Citing *In re Marriage of Rink* (1985), 136 Ill. App. 3d 252, Marilyn contends that by depositing his separate funds into the joint marital account, Robert is presumed to have made a gift of those funds to the marital estate. Therefore, according to Marilyn, the taxes were paid from marital property. Robert argues in response that the evidence establishes that he merely used the marital account as a conduit for the payment of real estate taxes from his own funds and that he did so as a matter of convenience. The parties have focused on the question of whether the funds used to pay property taxes became marital funds before the ultimate expenditure. More specifically, the parties have focused on whether the funds were a gift to the marital estate, but the matter is not so simple. Even if the funds were not a gift to the marital estate, they might nonetheless have been transmuted into marital property by virtue of commingling. See 750 ILCS 5/503(c) (West 1992). But see *In re Marriage of Landfield* (1991), 209 Ill. App. 3d 678, 694 (deposit of partnership income into common cash account did not result in transmutation where amount of partnership income was ascertainable and deposit into account did not result in a loss of identity).

We need not resolve the question, however, because we do not believe the issue of whether the funds originating from Robert's separate estate and ultimately expended on property taxes were marital property immediately before that expenditure is necessarily dispositive of the issue at hand. Even assuming, *arguendo*, that the deposit of the funds into the joint account transmuted the funds into marital

property for the brief period before their expenditure, in our view that circumstance should not preclude the trial court from attributing or "crediting" the payment of taxes to Robert (in the nonaccounting sense). The relevant statutory inquiry is the extent to which Robert contributed to the preservation of the property. (750 ILCS 5/503(d)(1) (West 1992).) We do not read the statute necessarily to exclude indirect contributions. To the extent Robert earmarked nonmarital funds for the payment of taxes on the marital residence and the funds were actually used for that purpose, the trial court could properly conclude that Robert contributed to the preservation of the property notwithstanding the temporary intermediate character of the funds as marital property. A contrary holding would exalt form over substance. Accordingly, the trial court's conclusion that Robert contributed to the preservation of the marital residence is supported by the record.

■ Marilyn next argues that, in awarding her only one-third of the value of the marital residence, the trial court failed to recognize the value of her contributions as a homemaker. Marilyn is correct that in distributing marital property the trial court must consider "the contribution of a spouse as a homemaker or to the family unit" (750 ILCS 5/503(d)(1) (West 1992)), and "a spouse's greater financial contributions do not *necessarily* entitle him or her to a greater share of the marital assets" (emphasis added) (*In re Marriage of Scoville* (1992), 233 Ill. App. 3d 746, 758). It is also true that in marriages of long duration a spouse's contributions as a homemaker take on greater importance in comparison to the source of marital assets than in short-term marriages. *E.g., In re Marriage of Zwart* (1993), 245 Ill. App. 3d 567, 574; *Scoville*, 233 Ill. App. 3d at 758; *In re Marriage of Cecil* (1990), 202 Ill. App. 3d 783, 791.

Even so, the trial court was in a better position than we are to evaluate the extent of Marilyn's contributions as a homemaker and to determine the significance of those contributions relative to Robert's financial contribution to the acquisition and preservation of the marital residence. In announcing its decision as to property distribution, the trial court expressly recognized Marilyn's contribution as a homemaker, and we cannot conclude that the trial court abused its discretion in finding that Robert's financial contributions outweighed Marilyn's contributions. We note that Marilyn has focused on her contributions in assuming certain parental responsibilities with respect to Robert's children from his first marriage. However, Robert's children only lived with the couple for a few years during their teens. Moreover, a spouse's contributions as a homemaker are of decreased importance when that spouse has been

employed outside the home. (*Zwart*, 245 Ill. App. 3d at 574.) Although Marilyn did not work outside the home during the entire duration of the marriage, she held several nursing positions at different times during the marriage and also pursued educational opportunities related to her profession. Accordingly, the trial court did not accord insufficient weight to Marilyn's contributions as a homemaker.

■ Marilyn next argues that, since the trial court found that Marilyn was eligible for maintenance but Robert was not in a financial position to pay maintenance, the trial court should have awarded her at least half the marital estate. Marilyn cites no authority and advances no well-reasoned argument in support of this contention, but merely asserts in a conclusory manner that the result she advocates seems logical and equitable. Statements unsupported by argument or citation of relevant authority do not merit consideration on review. (*Holmstrom v. Kunis* (1991), 221 Ill. App. 3d 317, 325.) Accordingly, the issue is waived.

■ Finally, Marilyn contends that the trial court erred in designating the $7,500 paid to her from the proceeds of the VKM fund pursuant to the agreed temporary order of August 23, 1991, as a "predistribution of marital assets." Instead, Marilyn contends, the trial court should have treated the $7,500 payment as a "lump sum distribution of temporary maintenance." Marilyn argues that she voluntarily left the marital residence in exchange for the $7,500 payment and Robert's agreement to pay $250 a week in temporary maintenance during the duration of the dissolution proceedings. But, according to Marilyn, when Robert was relieved of his obligation to make the periodic maintenance payments, she was forced to use the $7,500 to pay her rent and other necessary living expense while Robert had rent-free use of the marital residence. Marilyn further argues that Robert failed to demonstrate a substantial change of circumstances which would justify relief from his obligation to pay the previously agreed temporary maintenance (see 750 ILCS 5/510(a) (West 1992); Ill. Ann. Stat., ch. 40, par. 501, Historical & Practice Notes, at 378 (Smith-Hurd 1980) (section 510 applies to modification of temporary maintenance); accord *In re Marriage of Lang* (1979), 73 Ill. App. 3d 427, 430 ("change of circumstances" standard applied in review of order reducing agreed temporary alimony)) and the trial court should have applied the $7,500 payment to that obligation.

At the outset, we note that Marilyn has not specifically addressed the matter of what effect designating the $7,500 as "maintenance" would have on the division of property. Clearly, if that is how the payment should have been characterized, the trial court erred in treating the payment as an advance or predistribution of Marilyn's

award. The question remains, however, whether the payment should have been treated as an advance or predistribution to Robert or should simply have been excluded from the estate for purposes of calculating Robert's and Marilyn's respective shares. The $7,500 was paid from what was later determined to be marital property, and if we determine that the $7,500 should have been applied to satisfy Robert's maintenance obligation, it is arguable that the $7,500 should have been treated as an advance of Robert's share of the marital estate. Otherwise Robert would in effect be paying maintenance from marital property. It is not clear what Marilyn's position is in this regard. However, we need not resolve the question since we believe the precise issue of whether the $7,500 should be characterized as maintenance is not properly before us in this appeal.

The underlying premise of Marilyn's argument for designating the $7,500 as maintenance is that the trial court erred in terminating Robert's temporary maintenance obligation and should have allocated the $7,500 in a manner which would have corrected the error. In this regard, Marilyn does not really claim any independent error in the division of marital property, and, while Marilyn ostensibly appeals from the property distribution aspect of the judgment of dissolution in substance, she seeks review of the trial court's order of January 11, 1991, terminating Robert's temporary maintenance obligation. However, Marilyn did not specify that order in her notice of appeal. As in effect at the time Marilyn filed her notice of appeal, Supreme Court Rule 303(c)(2) (134 Ill. 2d R. 303(c)(2)) provided that the notice of appeal "shall specify the judgment or part thereof appealed from." Marilyn's notice of appeal only specified the judgment of dissolution and the trial court's subsequent order disposing of post-trial motions.

An unspecified judgment is reviewable if it is a step in the procedural progression leading to the judgment specified in the notice of appeal. (*Burtell v. First Charter Service Corp.* (1979), 76 Ill. 2d 427, 433-34; see also *Village of Lisle v. Village of Woodridge* (1989), 192 Ill. App. 3d 568, 572.) We do not believe the order of January 11, 1991, fits this description. The question of temporary maintenance was largely independent of the principal matters for adjudication in these proceedings: grounds for dissolution, disposition of property, and the propriety of permanent maintenance. With respect to permanent maintenance, we note that the Act expressly provides that a temporary order "does not prejudice the rights of the parties *** which are to be adjudicated at subsequent hearings in the proceeding." (750 ILCS 5/501(d)(1) (West 1992).) The trial court's ruling on temporary maintenance did not represent a determination of any

question of fact or law bearing on the matters mentioned above. Nor did the ruling otherwise directly contribute to the ultimate determination of those matters. (See, *e.g.*, *Smock v. Hale* (1990), 197 Ill. App. 3d 732, 738 (unspecified orders disqualifying plaintiff's medical expert and closing discovery schedule "directly contributed" to summary judgment specified in notice of appeal, and given the interrelationship between the specified and unspecified orders, the notice of appeal was sufficient to confer jurisdiction to review all of those orders).) Since the order terminating Robert's temporary maintenance obligation was not a step in the procedural progression leading to the judgment of dissolution, it is not reviewable given that only the judgment of dissolution and the order disposing of post-trial motions were specified in the notice of appeal.

While we do not reach the question of whether the trial court should have treated the $7,500 specifically as temporary maintenance, we agree with Marilyn that the trial court erred in treating the payment as an advance of her share of the marital estate. Marilyn claims that when Robert stopped paying temporary maintenance, she was forced to use the $7,500 to pay for housing and other living expenses. Marilyn contends, in essence, that it was unfair to charge these expenses entirely to her share of the marital estate while Robert had the rent-free use of the marital residence.

*In re Marriage of Seversen* (1992), 228 Ill. App. 3d 820, is instructive. In *Seversen*, during the pendency of dissolution proceedings, the trial court ordered the wife, Claudia, to vacate the marital home. Subsequently, Claudia's husband, Gordon, charged Claudia with dissipation of certain funds from the marital estate. "Dissipation" refers to the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcileable breakdown. (*Seversen*, 228 Ill. App. 3d at 824.) The trial court rejected Gordon's charge of dissipation and Gordon appealed. Claudia responded that she had used the funds in question to provide for her needs after Gordon secured the order excluding her from the marital residence and that the use of the funds for that purpose excused Gordon from paying maintenance. The *Seversen* court agreed with Claudia and the trial court that Claudia's use of marital property did not constitute dissipation.

The *Seversen* court observed that "[w]hen a couple live apart while undergoing a dissolution of marriage, the spouse who remains in the marital residence is allowed to spend marital funds for necessary, appropriate and legitimate living expenses including the maintenance of the marital residence." (228 Ill. App. 3d at 826.) The court

rejected the proposition that similar expenditures of marital funds by the spouse who, not by choice, is living away from the marital residence should constitute dissipation. The court found guidance in *In re Marriage of Hensley* (1991), 210 Ill. App. 3d 1043. In *Hensley*, the trial court had entered an order providing that "reasonable expenses caused by [the husband] having to live elsewhere than the marital home shall be taken out of marital assets on a share and share alike basis." (*Hensley*, 210 Ill. App. 3d at 1046.) The husband in *Hensley* was ultimately found to have dissipated marital assets because he was unable to account sufficiently for funds he claimed had been used for living expenses (210 Ill. App. 3d at 1053-54), but the *Seversen* court cited *Hensley* for the general proposition that "marital assets used by a spouse who is not able to live in the marital residence during the pendency of a dissolution of marriage proceeding should not necessarily be treated differently than the marital assets spent by a spouse who lives in the marital home during the dissolution proceeding." (*Seversen*, 228 Ill. App. 3d at 827.) The court further stated:

> "As the husband in *Hensley* had ' "to live elsewhere than the marital home," ' Claudia had to vacate the marital home by court order. (*Hensley*, 210 Ill. App. 3d 1046.) Under these particular circumstances, to penalize Claudia for spending [marital funds] on usual and necessary living expenses, such as food, rent and transportation, would seem unfair and unjust.
>
> The dichotomous treatment of spouses based on the location of their residence while they are in the process of dissolving their marriage defies reason and reality. During the marriage, the spouses do not differ in the need for usual living expenses. During the dissolution process, the needs of each party remain unchanged yet the disparate application of the dissipation principle penalizes one spouse while it condones the same type of expenditures for the other spouse." *Seversen*, 228 Ill. App. 3d at 827.

We embraced the reasoning in *Seversen* in *In re Marriage of Hagshenas* (1992), 234 Ill. App. 3d 178, 197, where we stated that "the expenditure of marital funds by one spouse for necessary, appropriate and legitimate living expenses at a time when the marriage is undergoing an irreconcilable breakdown will not be considered to be dissipation." Although dissipation, as such, is not at issue here, we think the underlying reasoning of *Seversen* and *Hagshenas* is applicable and leads to the conclusion that it was improper to designate the $7,500 spent on housing and other living expenses as an advance or predistribution of Marilyn's share of the marital estate. Since according to *Seversen* and *Hagshenas* the expenditures for housing and living expenses by a spouse forced to leave the marital

residence are not for the sole benefit of that spouse for a purpose unrelated to the marriage (*Seversen*, 228 Ill. App. 3d at 824; *Hagshenas*, 234 Ill. App. 3d at 194), we can see no reason why that spouse should be forced to pay those expenses entirely from his or her share of the marital property.

Here, like the wife in *Seversen*, Marilyn was deprived of the use of the marital residence by court order. Although Marilyn agreed to the entry of that order, she did so on the basis that she was to receive periodic temporary maintenance during the duration of the dissolution proceedings with which to defray the expenses of substitute housing. The trial court's order of January 11, 1991, terminated the temporary maintenance, but did not restore to Marilyn the right to occupy the marital residence. From that point in time forward, Marilyn's position was no different than that of the wife in *Seversen*. Marilyn was entitled to spend funds from the marital estate for housing and other living expenses made necessary by her lack of access to the marital home. It appears to be undisputed that Marilyn spent the $7,500 for such purposes, and it was error to charge the $7,500 to her share of the marital property.

Accordingly, the trial court should have treated the $7,500 as an allowance for housing and other living expenses during the pendency of the dissolution proceedings. Had the trial court done so, there would have been $65,000 in proceeds from the VKM fund for distribution. Since the court determined to distribute the VKM fund in equal shares, each party would have been entitled to $32,500. Since the earlier $7,500 payment was not a predistribution or advance, it should not have been applied to reduce the $20,000 amount Robert owed Marilyn for her one-third share of the marital residence, and Robert should have paid that full $20,000 to Marilyn from his share of the VKM fund proceeds. Thus, Robert's share of the VKM fund proceeds should be $12,500 ($32,500 − $20,000) instead of the $16,250 awarded by the trial court. Correspondingly, Marilyn's share should be $52,500 ($32,500 + $20,000) instead of the $48,750 awarded by the trial court.

■ We now turn to the issues presented in Robert's cross-appeal. Robert first argues that the trial court erred in determining that the marital residence and the VKM account were marital property. Generally, placing title to nonmarital property in joint tenancy raises the presumption of a gift to the marital estate which, while rebuttable, can only be overcome by clear and convincing evidence. (See *In re Marriage of Hunter* (1992), 223 Ill. App. 3d 947, 951.) Although both the marital residence and the VKM account were placed in joint tenancy, Robert argues that the evidence at trial was sufficient to overcome the presumption of a gift to the marital estate.

Various decisions have identified factors that are germane to the determination whether the presumption of a gift to the marital estate has been rebutted or shown to be unreasonable, but no such enumeration of factors purports to be exhaustive, nor do the cases claim to have devised a precise calculus for balancing the relevant factors. Some of the factors considered significant in determining whether the presumption of a gift to the marital estate has been overcome are "(1) the size of the gift relative to the entire estate; (2) who paid the purchase price, made improvements, and paid taxes for the property with solely acquired funds and exercised control and management over the property; (3) when the asset was purchased; and (4) how the parties handled their prior financial dealings with each other." (*In re Marriage of Hagshenas* (1992), 234 Ill. App. 3d 178, 188.) Also relevant is the occupancy of the premises as a home or business. *In re Marriage of Hunter* (1992), 223 Ill. App. 3d 947, 952.

It bears emphasis, however, that ultimately the focal point of any discussion dealing with the presence or absence of a gift is the intent of the alleged donor (see *In re Marriage of Cecil* (1990), 202 Ill. App. 3d 783, 788), and while the specific factors enumerated above are useful guides to discerning intent, they are not the exclusive criteria for determining whether or not a transfer of property into joint tenancy is a gift. As one court has observed based on its review of the case law, in cases where parties have sought to overcome the presumption of a gift, "[r]egardless of the success of their efforts, the question of the donor's intent was central to the discussion." *Cecil*, 202 Ill. App. 3d at 788.

With these principles in mind, we return to Robert's argument. Robert cites his testimony that he placed the marital residence and the VKM account in joint tenancy because Marilyn was "nagging" him to place assets in her name. Robert testified that he did not intend to make a gift, but intended the transfer to be "temporary satisfaction" to Marilyn. Evidence that Marilyn "nagged" Robert to put the property in her name might explain his motive for making a gift of the property, but it does not negate donative intent. To the contrary, the fact that the transfer was in response to Marilyn's expressed desire to obtain an interest in the property tends to establish that donative intent was, in fact, present.

While the alleged donor's testimony as to his or her intent is unquestionably relevant in the present setting, such testimony is not necessarily the most persuasive evidence of intent; "[t]he court must still consider all the circumstances and other evidence in determining what weight to give this testimony and in determining if the presumption [of a gift] has been overcome." (*Cecil*, 202 Ill. App. 3d at

788.) Thus, although Robert testified that he intended no gift, the trial court was not required to credit his testimony.

With respect to the various specific factors identified in *Hagshenas* and *Hunter*, it is true that certain factors favor Robert's position. The marital residence and the VKM fund were substantial in size relative to the entire estate. (*Hagshenas*, 234 Ill. App. 3d at 188.) Moreover, Robert correctly notes that his payment from nonmarital funds of property taxes on the parties' residence is somewhat indicative of an intent to keep the residence as his separate property. (*Hagshenas*, 234 Ill. App. 3d at 188.) We are unpersuaded, however, by Robert's argument that improvements to the marital residence which he funded rebut the presumption of a gift. (See *Hagshenas*, 234 Ill. App. 3d at 188.) While the record shows that Robert made certain improvements to the property with nonmarital funds or with loans from Marilyn which he repaid with nonmarital funds, certain improvements were made before the conveyance, and it is not clear from the record at what point in time certain other improvements were made. Improvements made before the conveyance of the marital residence into joint tenancy would seem to be of little, if any, relevance to the question of donative intent.

On the other hand, the use of the real property as the marital home supports the trial court's finding that Robert intended a gift to the marital estate. (See *Hunter*, 223 Ill. App. 3d at 952.) Moreover, as noted above, we think donative intent may be inferred from the immediate circumstances surrounding the transfer of the property, namely, that the transfer, was directly in response to Marilyn's request that she be given an ownership interest in the property. We also believe the trial court could properly have considered this evidence to be more probative than the other factors discussed.

With respect to the VKM fund, Robert notes that in 1986 he attempted to regain sole ownership of the account because Marilyn indicated she would spend the money in the account if she had the opportunity and because he discovered that he could not use the fund as collateral for a loan without her consent. While this evidence suggests that Robert may have regretted having placed the VKM account in joint tenancy, it is not particularly germane to Robert's intent when he placed the account into joint tenancy several years earlier.

Although Robert's position is not without support in the record, in view of all the relevant circumstances we cannot say the trial court erred in concluding that Robert failed to overcome the presumption of a gift to the marital estate of the marital residence and the VKM fund by clear and convincing evidence. Accordingly,

the trial court committed no error in finding those assets to be marital property.

■ Robert next argues that the trial court's six-year reservation of the issue of maintenance was excessively long. We have indicated that a "reserved-jurisdiction" approach to maintenance is appropriate in cases where the responsible party's present ability to pay maintenance is limited. (*In re Marriage of Scafuri* (1990), 203 Ill. App. 3d 385, 396, citing *In re Marriage of Shafer* (1984), 122 Ill. App. 3d 991, 999.) In *Scafuri*, the trial court reserved the issue of maintenance to the wife for a period of five years. The trial court apparently felt that at the time of the judgment of dissolution the wife had sufficient resources and assets to provide for her needs and also apparently decided that the circumstances were such that the wife should not be required to seek employment outside the home at that time. (*Scafuri*, 203 Ill. App. 3d at 395-96.) We disapproved of the reservation of maintenance under these circumstances, in part because it tended to protract the litigation, but also because the five-year period "does not get [the wife] moving in the right direction, *i.e.*, towards a position of self-sufficiency. In fact, this allows [the wife] to stagnate and move in the wrong direction, *i.e.*, continued dependence." (*Scafuri*, 203 Ill. App. 3d at 397.) Here, we are met with a similar situation. The six-year reservation of maintenance is too long and we find it represents an abuse of discretion. However, too brief a period of reserved jurisdiction would encourage Robert to defer efforts to become gainfully employed or otherwise improve his financial condition. The six-year period of reserved jurisdiction is lengthy; therefore, we hereby reduce it to three years.

Robert also argues that with only a high school education, and in view of his past employment history, his employment prospects are "thin" and it is unlikely that his ability to pay maintenance will improve. A three-year period will better establish this issue.

■ Finally Robert contends that the trial court erred in ordering him to report his income to Marilyn annually and to report gifts of $1,000 or more upon receipt. We note the trial court also ordered him to report inheritances. Robert's argument on this point consists entirely of the statement that he "can locate no statute or case law authority for this order and respectfully believes that such an order is beyond the power of the Court's authority from the statute." Marilyn has shown no authority that would allow her to reach Robert's future gifts or inheritances. We affirm the reporting requirement, setting forth hereafter the court's position on future gifts and inheritances understanding also the reporting requirement terminates in three years.

The trial court may properly consider the overall financial resources of the party from whom maintenance is sought. We do not mean to suggest that gifts or inheritances that a spouse *might* receive in the future should be treated as a present asset. (*Cf. In re Marriage of Schmidt* (1993), 242 Ill. App. 3d 961, 968 (with respect to property distribution "[p]otential inheritances are not property which can be valued and awarded to a spouse, although they can be given some consideration").) The reservation of maintenance in the present case did not violate that principle; the trial court did not base the distribution of property on future gifts, nor did the court make a *present* award of maintenance on the basis of anticipated gifts. The court merely reserved the issue, with the view that Robert's long-term financial condition, as it relates to ability to pay maintenance, would become clearer in the future.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is modified to provide that Marilyn shall receive $52,500 and Robert shall receive $12,500 from the proceeds of the VKM fund. It is further modified in that the issue of maintenance is reserved for three years. In all other respects, the judgment of the circuit court is affirmed.

Affirmed as modified.

INGLIS, P.J., and BOWMAN, J., concur.