NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210363-U

NO. 4-21-0363

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 6, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| MARY JO MAST | ) | Circuit Court of |
|      Petitioner-Appellant, | ) | Adams County |
|      and | ) | No. 16D196 |
| STEVE J. MAST, | ) | |
|      Respondent-Appellee. | ) | Honorable |
| | ) | Holly J. Henze, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justice Harris concurred in the judgment.
Justice Cavanagh specially concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:  The appellate court reversed the circuit court's decision denying reimbursement to the marital estate for payments made during the marriage toward the contract for deed to Loos Farm and remanded for further proceedings consistent with this order. The appellate court otherwise affirmed the circuit court's judgment on all other grounds.

¶ 2    The circuit court of Adams County entered a judgment of dissolution of marriage dissolving the marriage of petitioner, Mary Jo Mast, to respondent, Steve J. Mast, on December 16, 2020. The petitioner, however, appeals from the judgment because she takes issue with some of its provisions regarding the disposition of property. She raises five issues in her appeal.

¶ 3    First, the petitioner argues that the circuit court erred by classifying Loos Farm as the respondent's nonmarital property. We disagree and find it was not manifest error for the circuit court to classify Loos Farm as nonmarital property.

¶ 4 Second, the petitioner maintains the circuit court erred by failing to order reimbursement of the marital estate for payments made during the marriage on the contract for deed for that farm. We agree and remand for further proceedings consistent with this order.

¶ 5 Third, the petitioner contends that the circuit court erred by awarding the entire marital equity in Howell Farm to the respondent, considering that in a marital settlement agreement the parties had stipulated to an equal division of the marital estate. We hold that the marital settlement agreement was binding on the circuit court, including the stipulation that the marital estate was to be divided equally. See 750 ILCS 5/502(b) (West 2020). Awarding the respondent all of the marital equity in Howell Farm does not, in itself, violate the marital settlement agreement provided that the division of the marital estate as a whole is equal. On remand, the circuit court may consider whether any necessary reimbursement of the marital estate for payments on the contract for deed for Loos Farm affect the overall division of the marital estate, and if so, to what extent and make the necessary adjustments to remain consistent with the marital settlement agreement.

¶ 6 Fourth, even if the marital settlement agreement allowed the circuit court to award the respondent all of the equity in Howell Farm, the petitioner claims that the award was an abuse of discretion, considering that the court awarded Loos Farm to the respondent as his nonmarital property. We disagree.

¶ 7 Fifth, the petitioner argues that although, under the marital settlement agreement, the respondent was entitled to a credit of $231,795, the circuit court erred by deducting the credit from the petitioner's portion of the marital estate instead of deducting the credit from the marital estate as a whole in accordance with section 503(c)(2)(A) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503(c)(2)(A) (West 2020)). We are unconvinced by this

argument because nothing prevented the parties from entering into an agreement in derogation of section 503(c)(2)(A). The marital settlement agreement, which superseded any contrary directive in section 503(c)(2)(A), stipulated that the respondent was to receive a credit in the amount of $231,795 for his contribution of nonmarital property to the marital estate. The only way he could receive the full amount of that credit, as opposed to half the credit, was by deducting the $231,795 from the petitioner's portion of the marital estate. If the $231,795 had been deducted from the marital estate as a whole, the respondent effectively would have paid for half of his reimbursement out of his own pocket, considering that, under the marital settlement agreement, he already was entitled to half of the marital estate.

¶ 8        In short then, we find merit in one of the arguments, that the circuit court failed to order reimbursement of the marital estate for payments made, during the marriage, on the contract for deed for Loos Farm. We reverse the judgment, and we remand this case for further proceedings consistent with this order.

¶ 9                                    I. BACKGROUND

¶ 10        On December 28, 1991, the parties married. On October 17, 2016, the petitioner filed her petition to dissolve the marriage. The parties adopted two children during the marriage, but at the time of the trial, the children were emancipated. The parties were 59 years old.

¶ 11                          A. The Marital Settlement Agreement

¶ 12        On July 27, 2020, the parties signed a marital settlement agreement, which was titled "Stipulation and Agreement." In paragraph 5 of the agreement, they "stipulate[d] and agree[d] to the [c]ourt['s] making a 50/50 division of their marital estate." Broadly speaking, the respondent was to receive physical assets and real estate, and the petitioner was to receive cash. The agreement referenced an attached spreadsheet, which "list[ed] marital assets and non-marital

- 3 -

assets owned by the parties[,] including the net value of each marital asset and the areas of disagreement."

¶ 13    The disagreements were over four properties: Mast Productions (an agricultural business), Daniels Farm, Howell Farm, and Loos Farm. From the face of the agreement, both the values and classifications of these properties were subject to litigation, although that changed during testimony. The agreement stipulated to the values and classifications of the remaining properties. In summary, the agreement framed the property issues as follows:

"The only issues to be litigated and presented to the [c]ourt [are] in reference to [l]ine [i]tem[s] 1 [(Mast Productions in the attached spreadsheet)], 18 [(Daniels Farm)], 19 [(Howell Farm)], and 26 [(Loos Farm)]. The parties would ask the court to place a value on those [i]tems. [The respondent] agrees he would receive the marital assets as listed subject to a cash payment to [the petitioner] for her interest in the marital estate."

¶ 14    On September 18, 2020, a trial was held on both grounds and property issues. At the beginning of the trial, the parties informed the circuit court that they had reached an agreement on the value of Mast Productions, leaving three remaining issues for the court to resolve. Later in the trial, the parties informed the court that they likewise had agreed on the value of Daniels Farm, leaving only Howell Farm and Loos Farm in dispute. Still later in the trial, the parties agreed on the value of Loos Farm.

¶ 15                                B. Loos Farm

¶ 16    Loos Farm was a tract of 218 acres titled in the respondent's name. In the trial, the parties stipulated that the farm presently was worth $1,133,600. The respondent testified that in 1983 he entered into a 30-year contract for deed with Fred Loos for the purchase of the farm. The

contract for deed is not in the record. The respondent testified, however, that the purchase price for Loos Farm was $265,000, to be paid in annual installments, and that, at the time he married the petitioner, he owed $219,000 on the contract for deed. During the marriage, annual payments continued to be made to Fred Loos. In 2008, funds were borrowed to pay off the balance of $52,000 on the contract for deed. The recording date for the deed, which had been held in escrow since 1983, was May 12, 2008.

¶ 17    The deed had been signed on January 13, 1983, the date respondent entered into the contract, and remained in escrow as security until the final installment payment was made in 2008. Petitioner's exhibit No. 5 consisted of two checks, both made out to Loos Supply. One check, issued in March 2005, was in the amount of $20,000. The other check, issued in March 2007, was in the amount of $15,000. The respondent acknowledged, in his testimony, that those two checks were payments on the contract for deed. He testified he always made his annual payments and they ranged from $24,000, "down to about $18,000" at the end, depending on the interest rates at the time. He did not have possession of the records of other payments. The two checks which made up Petitioner's exhibit No. 5 had been drawn on First Bankers Trust account No. 047, an account the respondent opened solely in his name before the marriage as his "farm account." Respondent testified petitioner's name was placed on the account after marriage in order to facilitate her signing checks and paying bills from the account (she, at that time, "took care of the books" for the farms). According to him, "the only thing that went into that account was earnings off the farms," which included his paychecks and money received from the other farms. Respondent said none of petitioner's earnings were deposited into that account. Respondent testified that farm expenses and family living expenses were routinely paid from it.

¶ 18                              C. Howell Farm

¶ 19   Howell Farm, purchased in 2012, was held in the name of the respondent as 50% owner and in the names of his brother, Brent Mast, and Brent's spouse as the owners of the remaining 50%. According to the respondent's testimony, the issue for the circuit court to address was not the value of Howell Farm but, rather, its classification. The respondent claimed Howell Farm as his nonmarital property. He testified that he did not believe the parties were living together when he entered into the contract to buy this farm. He recounted a discussion he had with the petitioner regarding the proposed purchase of Howell Farm. She told him that "she didn't want her name on any more farmland[ ] and [that] she had her business that she needed some money for." As a result, the respondent gave her the same amount of money that he was putting down on the farm—he believed the amount was $17,500. The loan for the purchase of Howell Farm was financed by a mortgage with First Bankers Trust. The petitioner did not sign the promissory note, but she signed the mortgage and the hypothecation agreement.

¶ 20   The petitioner, in her testimony, agreed that she had been opposed to the purchase of Howell Farm—as she had been opposed to other purchases that nevertheless were made during the marriage. She also agreed that Howell Farm was purchased after the parties separated in 2011. She denied, however, that she ever agreed to the respondent's proposal to give her the same amount of money for her business that he would put down on the purchase of Howell Farm. She had no recollection of receiving a check in May or June 2012 pursuant to such an agreement. She acknowledged, however, receiving checks from the farm account on a regular basis throughout the marriage.

¶ 21      D. The Circuit Court's Classification and Disposition
         of Loos Farm and Howell Farm

¶ 22            1. *Loos Farm*

¶ 23    In an order entered on September 22, 2020, the circuit court announced its decision on the two properties that remained in dispute: Loos Farm and Howell Farm.

¶ 24    The circuit court found that Loos Farm met two of the statutory definitions of nonmarital property. First, according to the court's order, the farm met the definition in section 503(a)(6) of the Act (750 ILCS 5/503(a)(6) (West 2020)) in that "Loos Farm was purchased by the [r]espondent on contract for deed prior to the marriage." The order continued:

> "The title to the Loos Farm remained only in [the] [r]espondent's name throughout the course of the marri[age]. The [r]espondent testified that the [p]etitioner was not shy about demanding that her name be placed on the title to the farms purchased by the [r]espondent during the marriage. It was known by the [p]etitioner that the Loos Farm was considered to be the non-marital property of the [r]espondent."

¶ 25    Second, the circuit court found that the Loos Farm met the definition of nonmarital property in section 503(a)(7) of the Act, which defined nonmarital property to include "the increase in value of non-marital property, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section [(750 ILCS 5/503(c) (West 2020))]." 750 ILCS 5/503(a)(7) (West 2020). The court found no contribution to be reimbursed. After hearing all the evidence, the court accepted the respondent's testimony that, during the marriage, Loos Farm was "self-supporting." The court was unconvinced that the petitioner's contribution to the operation and support of Loos Farm was substantial enough to merit reimbursement. The court noted it was the petitioner's burden to prove both that the appreciation of the Loos Farm was the result of her efforts (*In re Marriage of Miller*, 231 Ill. App. 3d 480, 595 N.E.2d 1349 (1992)) and that she was entitled to reimbursement (*In re Marriage of Werries*, 247

- 7 -

Ill. App. 3d 639, 616 N.E.2d 1379 (1993)). The circuit court found the petitioner failed to carry that burden. Respondent acknowledged the petitioner "took care of the books" for the farms for a period of time after the marriage until 2003 or 2004 when they built an office building and hired a secretary. He also agreed she had taken meals to the fields on occasion and driven seed to the field "at times." This, however, when considered within the context of the amount of work involved in maintaining the farming operation as a whole, did not appear to the court to be sufficient to entitle the petitioner to reimbursement for marital contributions to the nonmarital estate. Further, when addressing not only petitioner's burden to show entitlement to reimbursement, but also how her efforts contributed to the appreciation in the farm's value, the court pointed out how petitioner testified she "was either a full-time college student obtaining a Bachelor's Degree in Finance and an MBA and then working full-time outside the home" throughout the course of the marriage.

¶ 26        The circuit court also found that placing petitioner's name on the farm account and having her pay all farm and some personal bills from this account was not sufficient commingling to transmute Loos Farm into marital property. Quoting from *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶¶73, 75, 17 N.E.3d 781, the circuit court noted, "there is no presumption that commingled property is always transmuted into marital property" and that "[n]onmarital property can maintain its identity even when deposited into a marital account." Based on the evidence before it, the court decided Loos Farm was the respondent's nonmarital property, free and clear of any obligation to reimburse the petitioner.

¶ 27                    2. *Howell Farm*

¶ 28        Although the circuit court found Howell Farm to be marital property because it was purchased during the marriage (see 750 ILCS 5/503(a) (West 2020)), the court awarded the equity in that farm solely to respondent. The court gave several reasons for this award. The respondent

bought the farm while the parties were separated. The petitioner had made it clear to the respondent that she wanted nothing to do with the purchase of any additional farmland. She never demanded to be added to the deed as a grantee, although, merely to avoid a dispute with the respondent, she signed the mortgage for the farm. The court believed the respondent's testimony that he gave to the petitioner a sum equal to that which he had put down for the farm ($17,500) for her cosmetics business.

¶ 29          E. The Judgment of Dissolution of Marriage, Including
              the Cash Payment of $881,112.45 to the Petitioner
              as Compensation for Her Share of the Marital Estate

¶ 30          On December 16, 2020, the circuit court entered a judgment of dissolution of marriage, which incorporated the marital settlement agreement and the court's ruling of September 22, 2020, on property matters. The judgment awarded all of the real estate to the respondent except for some rental property, which the parties had agreed would be sold. The court also awarded the respondent his interests in Mast Productions and Mast Farms. The respondent was to pay the petitioner $881,112.45 for her share of the marital estate. This figure of $881,112.45 was reached by deducting, from the petitioner's share of the marital estate, the respondent's agreed-upon credit of $231,795.

¶ 31                    F. The Amended Posttrial Motion

¶ 32          On January 14, 2021, the petitioner filed a posttrial motion, in which she challenged the circuit court's rulings regarding Howell Farm and Loos Farm.

¶ 33          On February 9, 2021, the petitioner filed an amended posttrial motion, reiterating those challenges and raising an additional issue: the payment of a credit to the respondent in the amount of $231,795 out of the petitioner's share of the marital estate instead of out of the marital estate as a whole. By a "mutual mistake" of the parties, as the petitioner put it, the $231,795 was

deducted out of the property apportioned to her instead of out of the marital estate as a whole as section 503(c)(2)(A) of the Act (750 ILCS 5/503(c)(2)(A) (West 2020)) required. The petitioner maintained that the award to her of $881,112.45 should be increased by $115,897.50, which was half of $231,795. If the $231,795 had been paid out of the marital estate as a whole in accordance with section 503(c)(2)(A), she would have borne only half of that obligation.

¶ 34   On June 11, 2021, the circuit court denied the petitioner's amended posttrial motion.

¶ 35   On June 23, 2021, the petitioner filed a timely notice of appeal.

¶ 36   II. ANALYSIS

¶ 37   A. The Classification of Loos Farm as the Respondent's Nonmarital Property

¶ 38   "All the property of the parties to a marriage belongs to one of three estates, namely, the estate of the husband, the estate of the wife, or the marital estate." *Foster*, 2014 IL App (1st) 123078, ¶ 68 (citing *Werries*, 247 Ill. App. 3d at 641-42). In order to dispose of property upon the dissolution of a marriage, the circuit court first must classify the property as either marital or nonmarital. *In re Marriage of Jelinek*, 244 Ill. App. 3d 496, 503, 613 N.E.2d 1284, 1289 (1993). "The trial court's classification of property as marital or nonmarital will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence." *Foster*, 2014 IL App (1st) 123078, ¶ 68. "A determination will be found to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident [citation] or the determination is unreasonable, arbitrary, or not based on the evidence presented [citation]." *In re D.F.*, 201 Ill. 2d 476, 498, 777 N.E.2d 930, 942-43 (2002). "Under a manifest weight of the evidence standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses and has a degree of familiarity with the evidence that a reviewing court

cannot possibly obtain. A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *D.F.*, 201 Ill. 2d at 498-99. The petitioner contends that by classifying Loos Farm as the respondent's nonmarital property, the circuit court made a finding that was against the manifest weight of the evidence. We disagree.

¶ 39 The circuit court found that Loos Farm met two of the statutory definitions of nonmarital property, those in section 503(a)(6) and (7) of the Act (750 ILCS 5/503(a)(6), (7) (West 2020)).

¶ 40 1. *Property Acquired Before the Marriage (Section 503(a)(6))*

¶ 41 Section 503(a)(6) of the Act provides as follows:

"(a) For purposes of this Act, 'marital property' means all property, including debts and other obligations, acquired by either spouse subsequent to the marriage, except the following, which is known as 'non-marital property':

* * *

(6) property acquired before the marriage ***." 750 ILCS 5/503(a)(6) (West 2020).

¶ 42 The respondent argues that he acquired Loos Farm before the marriage, when he signed the contract for deed, and that Loos Farm, consequently, is his nonmarital property within the meaning of section 503(a)(6). To the contrary, the petitioner maintains respondent acquired the farm in 2008 when he paid off the contract and obtained legal title, thereby making it marital property. Thus, the issue turns primarily upon the definition of "acquired" as used in 503(a)(6).

¶ 43   In *In re Marriage of Zamudio*, 2019 IL 124676, ¶ 19, 155 N.E.3d 1096, cited by both parties, the supreme court acknowledged section 503(a) did not define the term "acquired" so, recognizing the propriety of looking to dictionary definitions in such instances, it looked to Merriam-Webster's Collegiate Dictionary 11 (11th ed. 2014), and Black's Law Dictionary 26 (9th ed. 2009) for guidance. It found:

> "Merriam-Webster's Dictionary defines 'acquire' as '1: to get as one's own; a: to come into possession or control of often by unspecified means b: to come to have a new or added characteristic, trait, or ability (as by sustained effort or natural selection). *** 2: to locate and hold (a desired object) in a detector.' Merriam-Webster's Collegiate Dictionary 11 (11th ed. 2014)." *Zamudio*, 2019 IL 124676, ¶ 19.

¶ 44   The *Zamudio* court went on to note, "Black's Law Dictionary 26 (9th ed. 2009) defines the term as '[t]o gain possession or control of; to get or obtain.' " *Zamudio*, 2019 IL 124676, ¶ 19. Our supreme court adopted the Merriam-Webster's and Black's definitions, focusing their analysis and application on "obtain" and "possession or control." *Zamudio*, 2019 IL 124676, ¶ 23. Other courts have done likewise. For example, in *In re Marriage of Budorick*, 2020 IL App (1st) 190994, ¶ 45, 178 N.E.3d 726, the First District, within the context of marital versus nonmarital property and section 503(b)(2), found, " 'acquired,' as ordinarily and popularly understood, means gaining possession or control of."

¶ 45   Though petitioner cites *Zamudio*, she equates "acquire" with ownership and, in turn, equates ownership with legal title. We reject such a view. Legal title, contrary to the reasoning of petitioner, is not critical to ownership. Instead, it serves as notice to third parties and refers to a

legal relationship to the land but, in fact, has little to do with our analysis. " 'Title to property does not necessarily involve ownership of the property. Title refers only to a legal relationship to the land, while ownership is comparable to control and denotes an interest in the real estate other than that of holding title thereto.' " *In re Marriage of Marriott*, 264 Ill. App. 3d 23, 31, 636 N.E.2d 1141, 1147 (1994) (quoting *People v. Chicago Title & Trust Co.*, 75 Ill. 2d 479, 488, 389 N.E.2d 540, 544 (1979)); see also *Mason v. Rosewell*, 107 Ill. App. 3d 943, 946, 438 N.E.2d 653, 655-66 (1982) ("The word 'owner' is a broad, flexible word, applying not only to legal title holders but to others having control or enjoyment of the property.").

¶ 46        A definition of "acquire" that means "possession and control" finds support elsewhere in the law. In *Marriott*, the marital residence was held in a land trust, with the trustees (husband's parents) holding both legal and equitable title, and the beneficiary's (husband's) interest constituting personalty. *Marriott*, 264 Ill. App. 3d at 30-31. The property was then conveyed to both husband and wife after the marriage. The wife argued husband "had no 'legal interest or ownership interest in the realty' prior to the marriage." *Marriott*, 264 Ill. App. 3d at 31. Yet, the court found:

> "In the setting of a dissolution of marriage proceeding,
> where the inquiry pertains to a spouse's contribution to the
> acquisition of marital property, title is not of primary importance.
> Rather, it is the attributes of the beneficiary's interest—the power:
> (1) to possess, manage and physically control the real estate; (2) to
> receive all income generated by the property; (3) to direct the trustee
> in dealing with title to the real estate; and (4) to receive the proceeds
> of any sale of the property made pursuant to the power of direction

- 13 -

[citation]—that are most significant in determining ownership ***."

*Marriott*, 264 Ill. App. 3d at 31-32.

As we will see below, most of these indicia of ownership are frequently referenced in cases involving contracts for deed as well. A beneficial interest in a land trust, although clearly distinguishable, has significant similarities to the interest held by a contract purchaser in that both exercise control over the subject property while neither possess title thereto.

¶ 47 Contracts for deed, however, come in all flavors. In *Immanuel Evangelical Lutheran Church of Springfield v. Department of Revenue*, 267 Ill. App. 3d 678, 679, 642 N.E.2d 1344, 1345 (1994), the plaintiff church entered into a contract for deed with its pastor (Gall) for the parsonage. The contract required Gall to maintain insurance on the property and keep it in good repair. Further, the Galls were responsible for the payment of real estate taxes assessed against the property and had the option to pay off the contract at any time to receive title. Alternatively, they could relinquish the property to the church, receiving reimbursement of their equity and any improvements. The church's effort to qualify for a property tax exemption for the parsonage was denied by the Department of Revenue, finding Gall "has an equitable ownership interest in the property" and "Gall and his wife, for real estate tax purposes, are the owners." *Immanuel*, 267 Ill. App. 3d at 679-80. Citing *Chicago Title*, 75 Ill. 2d at 492, this court found, "Illinois tax law has long recognized ownership may be separated from title. The key elements of ownership are control and the right to enjoy the benefits of the property." *Immanuel*, 267 Ill. App. 3d at 682; see also *Farmers State Bank v. Neese*, 281 Ill. App. 3d 98, 102-103, 665 N.E.2d 534, 536-37 (1996) (stating both conventional purchase money mortgagees and contract for deed purchasers enjoy substantial ownership interests in the property, namely possession and control).

¶ 48 The petitioner, distinguishing between the equitable title a contract purchaser holds during the life of the contract and the legal title coming at the conclusion of the contract, finds the "interest" in the property held by the contract purchaser is insufficient to conclude he "acquired" the property during the life of the contract. According to the petitioner, respondent "only" had a right of contractual ownership once he made the final payment, and otherwise, he had no powers "other than the right to farm the land, and secure title after he had made the required payments." As authority, she cites *Estate of Mendelson v. Mendelson*, 2016 IL App (2d) 150084, 48 N.E.3d 891. Unfortunately, *Mendelson* does not hold "conveyance of ownership requires delivery of the deed," but merely that "[f]or a deed to be valid as an instrument of conveyance [of title], there has to be delivery." *Mendelson*, 2016 IL App (2d) 150084, ¶ 20. This relates only to the validity of a deed as an instrument of conveyance and has nothing to say about the legal rights of a property holder. More importantly, petitioner's asserted limitations on the powers of a contract purchaser are in error.

¶ 49 Once the contract for deed was fully executed, respondent could have sold his interest therein. An extreme example can be found in *Leaf v. Barton*, 91 Ill. App. 3d 373, 374, 414 N.E.2d 909, 910 (1980), where contract purchasers of certain real estate (Leaf) resold the property by contract for warranty deed to a third party (Barton), despite a provision in the original contract prohibiting resale without written consent of the first seller (Ahrens). When Barton defaulted, Leaf sued for a judgment on the unpaid balance and Ahrens intervened, seeking forfeiture of their contract and a declaration the Leaf-Barton contract was void. *Leaf*, 91 Ill. App. 3d at 374. Both the trial and appellate courts upheld the Leaf-Barton contract and found Ahrens was entitled to specific performance from Leaf and Leaf was entitled to specific performance from Barton. "[I]n Illinois, it is not essential to the validity of a contract to convey real estate that the vendor have title when

the contract is made. It is only necessary that the vendor be able to tender the deed when the specified time to give a warranty deed to vendee arrives." *Leaf*, 91 Ill. App. 3d at 375.

¶ 50    A less extreme example, and the fallacy in the petitioner's position, lies within the concept of equitable conversion, something she discards entirely.

> "Equitable conversion is the treating of land as personalty and personalty as land under certain circumstances. Hence, as between them, when the owner claiming through them, when the owner of land enters into a valid and enforceable contract for its sale he continues to hold the legal title, but in trust for the buyer; and the buyer becomes the equitable owner and holds the purchase money in trust for the seller. The conversion takes place at the time of entering into the contract. It stems from the basic equitable principle that equity regards as done that which ought to be done." (Internal quotation marks omitted.) *In re Estate of Krotzsch*, 60 Ill. 2d 342, 346, 326 N.E.2d 758, 760 (1975).

¶ 51    We addressed equitable conversion in *Farmers State Bank*, cited above, when determining the nature of the interest a taxpayer had in certain real property:

> "In real estate installment contracts, Illinois follows the doctrine of equitable conversion. [Citations.] Equitable conversion takes place at the instant a valid and enforceable contract is entered into and \*\*\* the buyer at that time acquires an equitable title. [Citation.] The owner 'continues to hold the legal title, but in trust for the buyer [ergo the similarity to the beneficial interest in the land trust in

- 16 -

*Marriott*, above]; and the buyer becomes the equitable owner and holds the purchase money in trust for the seller." (Internal quotation marks omitted.) *Farmers State Bank*, 281 Ill. App. 3d at 102.

We went on to note, "[t]his court has held the buyer under a real estate installment contract is the owner for real estate tax purposes." *Farmers State Bank*, 281 Ill. App. 3d at 102 (citing *Immanuel*, 267 Ill. App. 3d at 682).

¶ 52   More recently, in *United Community Bank v. Prairie State Bank & Trust*, 2012 IL App (4th) 110973, ¶ 35, 972 N.E.2d 324, we again explained equitable conversion:

"Assume that a vendor and a vendee enter into a binding contract for the sale of land but the vendee has not yet paid the purchase price to the vendor and the vendor has not yet delivered a deed to the vendee. In other words, the contract is still executory. 'By the terms of the contract the land ought to be conveyed to the vendee and the purchase price ought to be transferred to the vendor; equity therefore regards these as done: *the vendee as having acquired the property in the land, and the vendor as having acquired the property in the price*.' " (Emphasis added.) *Id.* (quoting 1 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 368, at 686 (4th ed. 1918) (hereinafter Pomeroy on Equity Jurisprudence)).

Most important to our analysis, however, is what follows:

"As a result, although the vendee as of yet lacks 'the confirmation of legal title for purposes of security against third persons,' *the vendee enjoys 'all the incidents of real ownership': for example, he*

- 17 -

*may convey the land, encumber it, and devise it by will.* [Citation.] Insomuch as the vendor's heirs, devisees, and grantees have 'notice' of the executory contract, it binds them, and as far as they are concerned, the vendor no longer has an interest in the land but instead has only a personal-property interest in the purchase money." (Emphasis added.) *United Community Bank*, 2012 IL App (4th) 110973, ¶ 35 (quoting Pomeroy on Equity Jurisprudence § 368, at 687 (4th ed. 1918)).

¶ 53        As we can see, the true purpose of legal title is as security against third parties, but it is not necessary for ownership, especially within the context of domestic relations law when determining whether respondent had possession and control, *i.e.*, ownership prior to the marriage. The property interest of a contract purchaser is more than some theoretical concept with few, if any, accompanying rights. The law governing land trusts, contracts for deed, and the doctrine of equitable conversion strengthen our view that possession and control are evidence a party "acquired" something. The record here confirms respondent enjoyed possession and control of Loos Farm from the date he signed the contract for deed.

¶ 54        By his testimony, respondent established the extent of his possession and control of the farm, both before and after the marriage, describing his farming of the land during the entirety of his ownership, planting and harvesting, and making improvements on the property from time to time. Respondent testified to his knowledge of the soil's productivity and tillable acreage and described how he received all the income generated by the farm, incurred the losses when they occurred, and put all money obtained from farming back into the farm. He described it as "paying for itself." There is a reason a circuit court's classification of property will not be disturbed on

- 18 -

appeal unless it is against the manifest weight of the evidence. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 76, 961 N.E.2d 1247. The reason for such a deferential standard of review is rooted in the fact that the characterization of assets typically depends on weighing witness credibility, as was the case here. See *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 819, 874 N.E.2d 916, 918 (2007).

¶ 55 Over 25 years, respondent's ownership interest in Loos Farm did not change, even when the contract was paid and title given. It does not go unnoticed that the deed to the farm was dated January 13, 1983, the date respondent entered into the contract for deed, and not in 2008 when the contract was paid off. It is clear both parties to the contract treated respondent as the owner of the farm from the inception of the contract and intended to do so. The facts in the case before us show respondent had possession and control of Loos Farm from 1983 to the present. He became the equitable owner of the farm the day he executed the contract for deed in January 1983. The farm was purchased in his name only, and title remained in his name throughout the course of the marriage. The circuit court found the evidence revealed petitioner did not hesitate to demand having her name placed on the title to farms purchased during the marriage. After hearing the evidence and observing the testimony of the parties, the circuit court found, "[i]t was known by the Petitioner that the Loos Farm was considered to be the non-marital property of the Respondent." The circuit court made further credibility determinations regarding conflicting testimony surrounding the "farm account" as it related to petitioner's claim of commingling. These were factual determinations by the circuit court based on its assessment of the witnesses' credibility. This court has repeatedly recognized that when, as here, a circuit court makes explicit credibility findings after hearing conflicting testimony, "we are at the height of our deference to that court." *People v. Carter*, 2021 IL App (4th) 180581, ¶ 68; see also *In re Ta. T.*, 2021 IL App

(4th) 200658, ¶ 57 ("We are especially deferential when, as here, the court makes an explicit credibility finding after hearing conflicting testimony.").

¶ 56 The nature of what respondent owned remained the same from 1983 on. Respondent's present property interest at the time of the dissolution was no different than the interest acquired prior to the marriage. He was free to do with the property what any other owner could, namely "convey it," "encumber it," or "devise it by will." *United Community Bank*, 2012 IL App (4th) 110973, ¶ 35. His interest was sufficient to make him responsible for real estate taxes (*Chicago Title*, 75 Ill. 2d at 493-94) and federal income taxes (*Farmers State Bank*, 281 Ill. App. 3d at 102). His open and visible possession of the property could defeat even a subsequent effort to mortgage the property to another, to the extent payments had been made (*Life Savings & Loan Ass'n of America v. Bryant*, 125 Ill. App. 3d 1012, 1019, 467 N.E.2d 277, 283 (1984)). During all times, he farmed it to the exclusion of all others, obtained the proceeds therefrom, and paid the contract payments as required. The deed he obtained upon full payment was dated the day he entered into the contract for deed. As respondent points out, the issue is when the farm was "acquired," not when the deed was turned over to him. *Leaf*, 91 Ill. App. 3d at 375.

¶ 57 Petitioner's focus on the securing of title as determinative of when respondent "acquired" the farm is not based on either the statute or case law. The question before us is whether the circuit court's order was manifestly erroneous. A decision is manifestly erroneous when the opposite conclusion is clearly evident. See *People v. Coleman*, 2013 IL 113307, ¶ 98, 996 N.E.2d 617. We find the circuit court's classification was well-supported by the evidence and the law, and an opposite conclusion is not clearly evident.

¶ 58 2. *The Increase in Value of Nonmarital Property*

¶ 59 Section 503(a)(7) is an exception to the rule that property acquired subsequent to the marriage is marital property. See 750 ILCS 5/503(a)(7) (West 2020) ("[T]he increase in value of non-marital property, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal efforts of a spouse, or otherwise, subject to the right of reimbursement" is nonmarital property.). The circuit court found Loos Farm's increase in value was nonmarital as defined in this section, for several reasons.

¶ 60 First, the circuit court found the petitioner was aware, and apparently did not dispute the fact, that Loos Farm was considered nonmarital, which would defeat any claim it was a gift under section 503(c)(2).

¶ 61 Next, as we mentioned above, the circuit court found the commingling of assets into the farm account was not sufficient to transmute Loos Farm itself into marital property. " 'The principle of transmutation is based on the presumption that the owner of the nonmarital property [(respondent here)] intended to make a gift of the property to the marital estate.' " *Foster*, 2014 IL App (1st) 123078, ¶ 74 (quoting *In re Marriage of Olson*, 96 Ill. 2d 432, 439, 451 N.E.2d 825, 828 (1983)). However, as the circuit court pointed out, " '[e]very act of commingling or every use of marital funds for the maintenance of nonmarital property, however, should not work a transmutation.' " *Foster*, 2014 IL App (1st) 123078, ¶ 75 (quoting *Olson*, 96 Ill. 2d at 440). The court in *Foster*, as well as the circuit court here, went on to point out that nonmarital property can maintain its identity even when deposited into a marital account. *Foster*, 2014 IL App (1st) 123078, ¶ 75.

¶ 62 According to the evidence, all proceeds from the farm were deposited into the farm account that had previously been in respondent's name only. After the marriage, according to respondent, petitioner's name was added to the account because she was helping with the books

and "signed checks and paid bills with it." According to him, she never deposited her checks into the farm account although he deposited everything earned from the farms, including grain sales and his own checks. The account had been his "farm account" before the marriage and remained the "farm account" after, although from time to time personal expenses were paid from it. The source of money going into the account was, to the satisfaction of the circuit court, found to be almost exclusively from the farm and respondent. Petitioner, who was a full time student at the beginning of the marriage, ultimately obtained an MBA and held professional positions commensurate with her education. She testified she only deposited her checks from work into the farm account "early on," which would have either been before or at the very start of her professional career. She had no records to verify that, although, to be fair, it appeared there were few records of anything. Respondent, who was directly and intimately involved in the operation of the farms, testified Loos Farm always "paid for itself." Petitioner was unable to dispute or agree with that statement without seeing income tax returns, she said.

¶ 63       As a result, the circuit court concluded any commingling of funds in the "farm account" was not sufficient to transmute the entire farm into marital property. If anything, the account served as a conduit for revenues and expenses of the farm, as well as to pay down the contract on the farm itself. " 'Although the placement of nonmarital funds into a joint checking account may transmute the nonmarital funds into marital property [citations], nonmarital funds that are placed into a joint account merely as a conduit to transfer money will not be deemed to be transmuted into marital property [citations].' " *In re Marriage of Berberet*, 2012 IL App (4th) 110749, ¶ 62, 974 N.E.2d 417 (quoting *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 673, 895 N.E.2d 1025, 1055 (2008)). In *Berberet*, it was the flow of nonmarital money deposited into a joint bank account from which the husband purchased certificates of deposit also found to be

nonmarital. In *Heroy*, it was rental proceeds from nonmarital real estate which were used to pay the note on the property. Those proceeds were deposited into the parties' joint checking account along with the husband's income from a law practice. *Heroy*, 385 Ill. App. 3d at 670-71. The First District found the husband "acquired real estate without ever using marital income or assets to secure and repay the original and subsequent loans on the property," paying for it from the income generated by the property. *Heroy*, 385 Ill. App. 3d at 672. It found the real estate to be nonmarital and depositing rental proceeds into a joint checking account did not transmute them into marital funds. "The placement of the funds into the couple's joint checking [account] was simply a conduit to transfer money," allowing the husband to satisfy his payment obligations. *Heroy*, 385 Ill. App. 3d at 673. We have a substantially similar situation here. Respondent deposited all proceeds from the farm, including his income, into the joint account, out of which he made the annual payment and paid all taxes and expenses associated with the farm. The circuit court found no credible evidence that any significant non-farm-related income went into the account; the farm "paid for itself."

¶ 64       Next, the circuit court concluded petitioner's minimal and sporadic contributions to the farm were not sufficient to warrant reimbursement or to conclude they substantially contributed to the farm's appreciation in value. Bookkeeping for the first few years of the marriage, along with driving a grain truck one summer and occasionally bringing things to the field, were not sufficient, in the eyes of the circuit court, to have substantially contributed to the farm's appreciation. Petitioner acknowledged she had been attending school "full-time" when they married and continued to do so until she obtained her MBA. After that, she was employed full-time in her chosen career, so her availability to be making significant personal contributions to the farm was limited at best. "Under the Dissolution Act, reimbursement is required when one estate

- 23 -

of property makes a contribution to another estate of property or when a spouse contributes personal efforts to non-marital property." *Jelinek*, 244 Ill. App. 3d at 506. "In the case of personal efforts, no reimbursement is to be made unless the effort is significant and results in substantial appreciation of the non-marital property." *Jelinik*, 244 Ill. App. 3d at 507. Here, the court was faced with weighing petitioner's minimal personal efforts against a farm respondent purchased in 1983 for $265,000 that had an appraised value at the time of divorce of $1,133,600. It was not against the manifest weight of the evidence for the circuit court to conclude her personal contributions could not have made any significant contribution to a 400% appreciation in value.

¶ 65                    3. *Reimbursement for Use of Marital Funds*

¶ 66            Despite the fact the circuit court found petitioner was not entitled to reimbursement for her personal efforts, or that the commingling of funds into or payments from the "farm account" did not transmute the farm into marital property, the circuit court made little mention of the status of the account itself, other than to note that nonmarital property can maintain its identity even when deposited into a marital account. The question remains regarding whether contribution is appropriate to the marital estate, not petitioner's estate, for the 17 payments made on the contract for deed during the course of the marriage. The circuit court found petitioner failed to meet her burden to show she was entitled to reimbursement for her personal contribution and that she was not entitled to reimbursement. The circuit court, however, even after the motion for reconsideration, did not specifically address reimbursement of the marital estate for the only reasonably traceable funds—the payments on the note. Respondent testified he deposited all of his income from the farm into the "farm account," which was jointly held after the marriage. "Although property acquired before marriage is non-marital and its increase in value is likewise non-marital, any income derived from such property during marriage is deemed marital." *In re*

- 24 -

*Marriage of Reed*, 100 Ill. App. 3d 873, 877, 427 N.E.2d 282, 285 (1981). "[R]emuneration to a spouse, in whatever form, during the marriage is considered marital property." *In re Marriage of Phillips*, 229 Ill. App. 3d 809, 818, 594 N.E.2d 353, 359 (1992). Under the language of section 503(a)(8), income from nonmarital property is nonmarital only "if the income is *not* attributable to the personal efforts of a spouse." (Emphasis added.) 750 ILCS 5/503(a)(8) (West 2020). Here, respondent's paychecks were clearly attributable to his personal efforts—his work on and for the farm. As he testified, he performed all aspects of farming the Loos Farm, from preparing the soil and planting to harvesting and transporting the grain for sale. His income was attributable to his personal efforts and was deposited in the account jointly held with petitioner. In addition, both parties acknowledged there were payments made from the account that were clearly marital expenses.

¶ 67        The annual payments that the respondent made on the contract for deed before the marriage were, it is true, his nonmarital property. But the 17 additional annual payments that he made on the contract for deed during the marriage were marital property not only because those payments came out of the commingled funds in the joint account, but because the funds contained therein included income presumed to be marital. 750 ILCS 5/503(a)(8) (West 2020). Under section 503(c)(1)(B) of the Act, transmutation is not necessarily the end of the story. Transmutation is "subject to the provisions of paragraph (2) of this subsection (c) [(750 ILCS 5/503(c)(2) (West 2020))]." 750 ILCS 5/503(c)(1)(B) (West 2020). Section 503(c)(2)(A) in turn provides as follows:

> "When one estate of property makes a contribution to another estate
> of property, the contributing estate shall be reimbursed from the
> estate receiving the contribution notwithstanding any transmutation.
> No such reimbursement shall be made with respect to a contribution

that is not traceable by clear and convincing evidence or that was a gift." 750 ILCS 5/503(c)(2)(A) (West 2020).

¶ 68 The respondent testified that, at the time he married the petitioner, he owed $219,000 on the contract for deed. According to the respondent's testimony, he made a total of $46,000 in payments on the contract for deed before the marriage (the purchase price of $265,000 minus the amount owed of $219,000 equaled $46,000). On remand, the circuit court should calculate the amount the marital estate should be reimbursed for the payments made during the marriage (respondent said payments varied from a high of $24,000 to a low of $18,000 before he secured the loan to pay off the outstanding balance in 2008). Having done so, the court would then need to determine how that reimbursement should be divided between the parties in light of the court's distribution of marital and nonmarital property not otherwise affected by this order.

¶ 69 B. The Award of Howell Farm to the Respondent

¶ 70 The circuit court found Howell Farm to be marital property. Nevertheless, the court awarded the equity value of Howell Farm entirely to the respondent. This award, in the petitioner's view, violated the marital settlement agreement, paragraph 5 of which provided, "[The parties] stipulate and agree to the [c]ourt['s] making a 50/50 division of [the] marital estate."

¶ 71 Section 502(a) and (b) of the Act, a section titled "Agreement," provided as follows:

"(a) To promote amicable settlement of disputes between parties to a marriage attendant upon the dissolution of their marriage, the parties may enter into an agreement containing provisions for disposition of any property owned by either of them ***.

- 26 -

(b) The terms of the agreement, except those providing for the support and parental responsibility allocation of children, are binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, on their own motion or on request of the court, that the agreement is unconscionable." 750 ILCS 5/502(a), (b) (West 2020).

On the authority of that quoted statute, the appellate court has held that

"when *** the parties in a dissolution action enter into a stipulation as to the value and division of some portion of the marital estate, the terms of that agreement are binding upon the court. The trial court, unless it finds the agreement unconscionable as provided in section 502 of the Act, must give full effect to the terms stipulated by the parties before dividing the remainder of the marital estate." *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 776-77, 690 N.E.2d 1023, 1028-29 (1998).

According to the petitioner, the circuit court failed to give effect to paragraph 5 of the marital settlement agreement. After finding Howell Farm to be marital property, the court awarded to the respondent all of the marital equity in that farm. This award, the petitioner argues, failed to honor the parties' agreement to "a 50/50 division of their marital estate."

¶ 72 The respondent counters that awarding him the equity in Howell Farm was consistent with paragraph J of the marital settlement agreement. In paragraph J, the parties agreed as follows: "Line items 18, 19, and 26, each party's interest in these asset[s] would be determined

by the [c]ourt." Line item 18 was Daniels Farm, line item 19 was the Howell Farm, and line item 26 was the Loos Farm. In the respondent's view, awarding to him all the marital equity in Howell Farm was allowable under paragraph J, which stipulated that "each party's interest" in this asset "would be determined by the [c]ourt."

¶ 73 Because marital settlement agreements are contracts, we interpret marital settlement agreements *de novo*, using the same principles of construction that we would apply to any other contract. *Blum v. Koster*, 235 Ill. 2d 21, 33, 919 N.E.2d 333, 340 (2009). According to one of these interpretive principles, "[a] contract is to be construed as a whole, giving meaning and effect to every portion thereof, if possible, and not resorting to detached portions thereof standing alone." *Coles-Moultrie Electric Cooperative v. City of Sullivan*, 304 Ill. App. 3d 153, 159, 709 N.E.2d 249, 253 (1999). "Courts should make reasonable efforts to harmonize apparently conflicting provisions." (Internal quotation marks omitted.) *Coe v. BDO Seidman, L.L.P.*, 2015 IL App (1st) 142215, ¶ 27, 40 N.E.3d 393. Giving effect to both paragraph 5 and paragraph J and harmonizing them, we interpret paragraph J as meaning only that the circuit court is to determine the parties' *present* interest in Daniels Farm, Howell Farm, and Loos Farm by *classifying* those farms: whether as the petitioner's nonmarital property, the respondent's nonmarital property, or marital property.

¶ 74 Dividing the marital estate equally does not necessarily mean an equal division of each item of marital property. Awarding the respondent all of the marital equity in Howell Farm is permissible under paragraph 5 of the marital settlement agreement provided that the division of the marital estate as a whole is equal. The court may award the petitioner a lesser share of one farm and a greater, offsetting share of another farm.

¶ 75    The petitioner argues that even if the marital settlement agreement did not require the circuit court "to apportion the equity of the Howell Farm equally between the Parties, the question then to be addressed is whether the award of the entirety of the equity to [the respondent], which the parties agreed was $71,440.50, particularly where [the respondent] was being assigned the Loos Farm as his nonmarital property, was an abuse of discretion." Loos Farm, the petitioner notes, was "valued at $1,133,000." Thus, she points out, the respondent "is leaving the long-term marital partnership with $1.1 million more of asset[s] to provide for himself now and in the near future than that received by [her]." On top of that unfairness, the petitioner complains, the circuit court awarded the respondent all of the equity in Howell Farm.

¶ 76    We note that, on remand, paragraph 5 of the marital settlement agreement will obligate the circuit court to accomplish a "a 50/50 division of [the] marital estate," subject to any statutory rights of reimbursement and subject to any credits to which the parties have stipulated in their agreement. Under the literal terms of the marital settlement agreement, the court is free to award a party a greater share of a particular farm than the court awards the other party, but in the end, there must be "a 50/50 division of [the] marital estate," as the agreement stipulates.

¶ 77    C. Paying the Respondent the Credit of $231,795 out of the Petitioner's
        Share of the Marital Estate Instead of out of the Marital Estate as a Whole

¶ 78    The parties agreed that the respondent was entitled to a credit in the amount of $231,795 for his nonmarital contribution to the marital estate. In the words of the marital settlement agreement, the respondent was to be "given credit for $231,795 as [the] premarital value of various assets that he had prior to the marriage." "However," to quote from the petitioner's brief, "the figure for the payment to be made to [the petitioner] which was inserted in the Judgment of Dissolution of Marriage, $881,112.45, was the result of an error of calculation by the parties in which all of the $231,795 was taken from [the petitioner's] share in the marital estate."

- 29 -

¶ 79          According to the petitioner, paying the $231,795 to the respondent out of the petitioner's share of the marital estate was inconsistent with section 503(c)(2)(A) of the Act, which provided as follows: "When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation." 750 ILCS 5/503(c)(2)(A) (West 2020). All of the property of the parties to a marriage belongs to one of three estates: the petitioner's nonmarital estate, the respondent's nonmarital estate, or the marital estate. *Werries*, 247 Ill. App. 3d at 641-42. The petitioner reasons:

> "In the instant case, there was no contention in the Stipulation or elsewhere, that the property which [the respondent] had at the marriage still existed at the time of the divorce. Indeed, if that were the case, there would be no reason for him to receive 'a credit,' or for there to be any reduction of the payment due [the petitioner] for the marital assets being retained by [the respondent], because he would be assigned those premarital assets separately. Therefore, under the provisions of the [Act], the value of [the respondent's] property at the marriage was compensable only under subsection (c)(2)(A), as a nonmarital contribution, and, as there was no suggestion that it had been contributed to a nonmarital estate of [the petitioner], it was compensable consistent with the [Act] as a contribution to the marital estate."

Thus, the petitioner argues, the contribution of $231,795 that the respondent had made to the marital estate should have been reimbursed out of the marital estate as a whole, not out of the share of the marital estate distributed to the petitioner. See 750 ILCS 5/503(c)(2)(A) (West 2020).

¶ 80 The award of $881,112.45 to the petitioner presupposed a deduction of $231,795 from her share of the net marital estate—a deduction in accordance with the marital settlement agreement. "The terms of the agreement *** are binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties *** that the agreement is unconscionable." 750 ILCS 5/502(b) (West 2020). "A marital settlement agreement is unconscionable if there is an absence of a meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." (Internal quotation marks omitted.) *In re Marriage of Baecker*, 2012 IL App (3d) 110660, ¶ 41, 983 N.E.2d 104. The appellate court added in *Baecker*, "The fact that an agreement merely favors one party over another does not make it unconscionable." (Internal quotation marks omitted.) *Baecker*, 2012 IL App (3d) 110660, ¶ 41. The petitioner does not argue that the marital settlement agreement is unconscionable. She does not suggest that she lacked meaningful choice when deciding whether to sign the agreement or that the agreement as a whole is so one-sided as to be "oppressive." (Internal quotation marks omitted.) *Baecker*, 2012 IL App (3d) 110660, ¶ 41.

¶ 81 Instead, the petitioner contends that the marital settlement agreement contains an oversight, an error: the $231,795 was reimbursed from her share of the marital estate instead of from the marital estate as a whole as section 503(c)(2)(A) of the Act required. The petitioner notes that this error is not the only one to be found in the marital settlement agreement. In the spreadsheet attached to the agreement, the amount of $231,795 appears in parentheses, and thus as a debit, not only in the column labeled "Petitioner Calc[ulated] Value" but also in the column labeled

"Respondent Calc[ulated] Values"—signifying, inexplicably, that $231,795 likewise was to be deducted from the respondent's share of the marital estate. Understandably, then, when the respondent uses the agreement against the petitioner by pointing out the deduction of $231,795 in the petitioner's column, the petitioner answers in kind: she points out the identical deduction of $231,795 in the respondent's column. A major purpose of the marital settlement agreement is expressed in paragraph 6(h): that the respondent be "given credit for $231,795 as premarital value of various assets that he had prior to the marriage." Giving effect to the deduction of $231,795 in the petitioner's column would effectuate that purpose but giving effect to the deduction of $231,795 in the respondent's column would defeat that purpose.

¶ 82 Granted, the debit of $231,795 in the respondent's column is just as much a term of the marital settlement agreement as the debit of $231,795 in the petitioner's column, and "[t]he law prefers an interpretation which gives effect to all parts of the contract rather than one which leaves part of the contract ineffective or meaningless." 11 Williston on Contracts § 32:9 (4th ed.). Williston, however, adds a qualification. If parts of a contract are in irreconcilable conflict such that logic demands a choice between one part or the other,

> "the court will seek to interpret the contract in a way that will at least effectuate the principal or main apparent purpose of the parties. Furthermore, if part of the contract is irreconcilable with the main purpose of the contract, that part will be given no effect in order that the main purpose of the contract can be achieved. Similarly, sometimes particular words or provisions of a contract will be disregarded in order to give effect to the general meaning of a contract." 11 Williston on Contracts § 32:9 (4th ed.).

In our *de novo* interpretation of the marital settlement agreement (see *Blum*, 235 Ill. 2d at 33), we disregard the debit of $231,795 in respondent's column in order to give effect to the parties' express intention to reimburse the respondent in that amount for his contribution of premarital assets (see *Premier Title Co. v. Donahue*, 328 Ill. App. 3d 161, 166, 765 N.E.2d 513, 517 (2002); 11 Williston on Contracts § 32:9 (4th ed.)). We need not disregard the debit of $231,795 in the petitioner's column in order to give effect to that intent. Absent a finding of unconscionability, the debit in the petitioner's column was binding on the circuit court. See 750 ILCS 5/502(b) (West 2020). To quote from the petitioner's brief, "[t]here was no contention of fraud or unconscionability in this case."

¶ 83          Even so, the petitioner maintains that the circuit court should have reformed the marital settlement agreement on the ground of mutual mistake. We are unconvinced that by finding the requisites of contract reformation to be unmet, the circuit court made a decision that was against the manifest weight of the evidence. See *Novak v. Smith*, 197 Ill. App. 3d 390, 398, 554 N.E.2d 652, 656 (1990). To quote from a case cited by the petitioner, "[i]n order for a party to reform a contract on the basis of mutual mistake, two elements must be present: (1) the mistake must be mutual; and (2) an agreement other than that expressed in writing must have been reached." *In re Marriage of Shaner*, 252 Ill. App. 3d 146, 157, 624 N.E.2d 1217, 1225 (1993). Also, "[b]efore a written instrument will be reformed, the party seeking reformation must prove by clear and convincing evidence that the instrument as it now stands does not properly reflect the true intention of the parties, and that there has been either a mutual mistake or mistake by one party and fraud by the other." *Novak*, 197 Ill. App. 3d at 397-98. The record appears to lack clear and convincing evidence that the parties entered into an agreement contrary to that expressed in paragraph 6(h) of their settlement agreement. In that paragraph, they agreed that the respondent should be "given

credit for $231,795 as premarital value of various assets that he had prior to the marriage." Given the simultaneous agreement, in paragraph 5, that the marital estate would be divided equally, paying the respondent the $231,795 out of the marital estate effectively would allow him a credit in only half that amount. We are aware of no agreement whereby the respondent would be afforded a credit of $115,897.50 instead of a credit of $231,795 as the parties agreed in paragraph 6(h) ($231,795 divided by 2 equals $115,897.50).

¶ 84 The parties clearly indicated in their marital settlement agreement that the respondent was to receive a credit in the full amount of $231,795. Under section 503(c)(2)(A) of the Act, he would not receive the full amount of that credit.

¶ 85 Therefore, we find no error in the denial of the petitioner's request, in her amended posttrial motion, that the court deduct the $231,795 from the marital estate as a whole instead of from her share of the marital estate.

¶ 86 III. CONCLUSION

¶ 87 Because we find the circuit court failed to address the reimbursement of the marital estate for the payments made on the contract for deed during the course of the marriage, we remand this case for further proceedings consistent with this order.

¶ 88 Affirmed in part and reversed in part; cause remanded for further proceedings.

¶ 89 JUSTICE CAVANAGH, concurring in part and dissenting in part:

¶ 90 While otherwise agreeing with the majority's decision, I respectfully disagree that Loos Farm is the respondent's nonmarital property. For reasons I will lay out, I would hold, *de novo*, that Loos Farm is instead marital property, subject to the respondent's right of reimbursement for any contributions of nonmarital property that are "traceable by clear and convincing evidence." 750 ILCS 5/503(c)(2)(A) (West 2020).

¶ 91          A. The Standard of Review Applicable to the Classification of Loos Farm

¶ 92          My disagreement with the classification of Loos Farm begins with the standard of review. The majority holds that the standard of review on the question of the farm's classification is deferential: that we should ask whether, by classifying the farm as the respondent's nonmarital property, the circuit court made a decision that was against the manifest weight of the evidence. As the appellate court held, however, in a case cited by the majority, "where *** the facts are not in dispute, we review the trial court's classification of property *de novo*." *Budorick*, 2020 IL App (1st) 190994, ¶ 55. According to another case cited by the majority, a deferential standard of review would be "based on the presumption that determining whether an asset [was] marital involve[d] weighing the credibility of witnesses." *Joynt*, 375 Ill. App. 3d at 819. If, however, the "facts are not in dispute[ ] and the witnesses' credibility is not at issue"—if "the parties have asked us to rule on the legal effect of certain facts"—our review of a property classification is *de novo. Id.*

¶ 93          To be sure, there were factual disputes regarding Loos Farm. Even so, the mere existence of a factual dispute regarding the farm does not automatically make the dispute legally relevant to the farm's classification. It appears to me that the facts relevant to the farm's classification are undisputed. The parties agree that, before the marriage, the respondent made payments on the contract for deed. They further agree that, during the marriage, he made the rest of the payments whereupon Fred Loos delivered to him the deed to the farm. Those are the only facts that are, to my thinking, *material* to the farm's classification. As the petitioner argues by her invocation of section 503(c)(1)(B) (750 ILCS 5/503(c)(1)(B) (West 2020)), that narrow set of undisputed facts calls for a legal conclusion that Loos Farm is marital property by transmutation, subject to any right of reimbursement for premarital installment payments. In a moment, I will

explain why this transmutation of nonmarital property into marital property should be deemed to have occurred.

¶ 94        B. "Acquisition" as "Possession" and "Control" (Section 503(a)(6))

¶ 95        The majority reasons essentially as follows. Under section 503(a)(6) of the Act (*id.* § 503(a)(6)), " 'non[ ]marital property' " includes "property *acquired* before the marriage." (Emphasis added.) In *Zamudio*, the supreme court defined the word " 'acquire' " in section 503(a)(6) as meaning " 'to come into possession or control of often by unspecified means.' " *Zamudio*, 2019 IL 124676, ¶ 19 (quoting Merriam-Webster's Collegiate Dictionary 11 (11th ed. 2014)). Before the marriage, the respondent possessed and controlled Loos Farm, "planting and harvesting, and making improvements on the property from time to time." *Supra* ¶ 54. Ergo, the majority concludes, the respondent acquired Loos Farm before the marriage, and the farm is his nonmarital property. By that logic, though, a car borrowed from a friend would be, implausibly, the borrower's nonmarital property because the borrower had come into possession and control of that car.

¶ 96        Allow me to point out how, in my view, the majority's interpretation of "acquire" goes awry. The supreme court writes in *Zamudio*, "Merriam-Webster's Dictionary defines 'acquire' as '1: to get as one's own: a: to come into possession or control of often by unspecified means ***." *Id.* (quoting Merriam-Webster's Collegiate Dictionary 11 (11th ed. 2014)). The phrase " 'to get as one's own' " is followed by a colon. "A colon introduces an element or a series of elements illustrating or amplifying what has preceded the colon." Chicago Manual of Style § 6.63, at 257 (15th ed. 2003). Therefore, the phrase " 'come into possession or control' " must be understood as an amplification of, or as an expanded statement of, the phrase " 'to get as one's own,' " or as belonging to oneself. When defining " 'acquire' " as " 'to come into

- 36 -

possession or control of' " something, the *Zamudio* court means possession or control as incidents of owning the thing. This meaning comes through most clearly in the *Zamudio* court's observation that "[t]he military service *** only made [the spouse] eligible to *purchase or 'acquire'* the permissive service credit through the monetary contribution required by the Pension Code"—as if "purchase and " 'acquire' " were synonymous. (Emphasis added.) *Zamudio*, 2019 IL 124676, ¶ 23.

¶ 97 Before the marriage, the respondent was still in the process of acquiring, or purchasing, Loos Farm. He did not yet own the farm. The deed from Fred Loos to him was as of yet undelivered—the deed was held in escrow—and "[d]elivery of a deed is necessary to give it binding effect." *Logue v. Von Almen*, 379 Ill. 208, 216 (1941).

¶ 98 I do not understand the petitioner as disputing, nor do I dispute, that there can be rights of ownership without a deed. Her point, however, is that we should be clear and accurate as to what exactly the respondent owned before the marriage compared to what he owned during the marriage. Before the marriage, it is true, he possessed and controlled Loos Farm—but not " 'as [his] own.' " *Zamudio*, 2019 IL 124676, ¶ 19 (quoting Merriam-Webster's Collegiate Dictionary 11 (11th ed. 2014)). Therefore, it is erroneous to say he "acquired" Loos Farm before the marriage as *Zamudio* uses the term "acquire."

¶ 99 I do not understand the petitioner as disputing that, before the marriage, the respondent had a genuine ownership interest with respect to Loos Farm. Property includes "obligations" (750 ILCS 5/503(a) (West 2020)), and Fred Loos's obligations to the respondent under the executory contract for deed were property. The respondent's rights under the executory contract for deed had value and became more valuable the more payments he made and as the price of land went up. The petitioner's acknowledgment of the respondent's preexisting

ownership interest is implicit in her remark that premarital payments on a contract for deed could merit reimbursement under section 503(c)(1)(B) (750 ILCS 5/503(c)(1)(B) (West 2020)).

¶ 100     As the petitioner argues, however, section 503(a) defines " 'marital property' " to mean "*all* property *** acquired by either spouse subsequent to the marriage." (Emphasis added.) *Id.* § 503(a). Therefore, it is necessary to consider whether, during the marriage, the respondent acquired any additional property interest with respect to Loos Farm. To deny that he acquired any additional property interest in the farm during the marriage would raise the obvious question of why he made payments to Fred Loos during the marriage—payments that, as the majority correctly recognizes, were made with marital funds. The answer is that he was buying, on the installment plan, a higher estate than the forfeitable equitable estate that he had under the executory contract for deed: he was buying fee simple, "the broadest property interest allowed by law." Black's Law Dictionary (11th ed. 2019) ("fee simple"). "A legal title interest always constitutes property ***." 1 Brett R. Turner, Equitable Distribution of Property § 5:9 (4th ed. 2021) (hereinafter Turner on Property).

¶ 101     Just as the respondent's premarital equitable interest under the contract for deed should not be discounted, the additional legal title interest that he acquired during the marriage should not be discounted, either. The 17 annual payments and final, accelerated payment that he made to Fred Loos during the marriage were not charitable donations. Rather, the respondent was buying the delivery of the deed—and the delivery of the deed was more than a gesture. Loos Farm was conveyed to him by the delivery of the deed, and not a moment sooner. "A conveyance of real property does not occur merely through the execution of a deed. The grantor must also deliver the deed, and the grantee must accept it. [Citations.] Delivery of a deed is

- 38 -

essential to complete a conveyance ***." *In re Estate of Gabbett*, 352 Ill. App. 3d 900, 903-04 (2004).

¶ 102        By the delivery of the deed to him, the respondent was empowered to convey Loos Farm to someone else if he so desired. He hitherto was powerless to do so. After all, it would have done Fred Loos little good to "hold[ ] legal title as security for payment of the purchase price" if, before making the final installment payment, the respondent could have conveyed the farm out from under him. 17 Williston on Contracts § 50:42 (4th ed. 2021). Being able to convey the farm to a third party was a valuable property right, and the respondent acquired that ability only when, during the marriage, Fred Loos delivered to him the deed. Granted, before receiving the deed to Loos Farm, the respondent could have entered into a *contract* with a third party to convey Loos Farm to the third party. See *Leaf*, 91 Ill. App. 3d at 375. But "[i]t is *** necessary that the vendor be able to tender the deed when the specified time to give a warranty deed to vendee arrives." *Id.* Until he received the deed from Fred Loos, the respondent would have been unable to perform such a contract with a third party. The ability to convey the farm itself was a property right that the respondent acquired during the marriage, partly by paying Fred Loos tens of thousands of dollars of marital funds.

¶ 103        I acknowledge that, in *United Community*, 2012 IL App (4th) 110973, ¶ 35, when discussing Pomeroy's treatise on equity jurisprudence, the appellate court remarks that the vendee in an executory contract for deed "may convey the land." Unfortunately, however, in its paraphrasing of Pomeroy, the appellate court in *United Community* slips into imprecision. Pomeroy actually reads as follows: " 'As the vendee has acquired *the full equitable estate*,— although still wanting the confirmation of the legal title for purposes of security against third persons,—he may convey or encumber *it* ***.' " (Emphases added.) 5 S. Symons, Pomeroy's

Equity Jurisprudence § 368, at 23 (5th ed. 1941). The antecedent of "it" is "the full equitable estate." The vendee may convey and encumber "the full equitable estate," not the land. Moreover, "the full equitable estate" means the estate the vendee acquires upon making the final payment—which the respondent in the present case did during the marriage, not before. "[A]n equitable interest accrues in the vendee to the extent of his payments. And when the contract price is finally paid, the full equitable estate vests in the purchaser and the seller retains the naked legal estate in trust for him." *West-Nesbitt, Inc. v. Ralston Purina Co*., 266 A.2d 469, 472 (Vt. 1970).

¶ 104 Until the respondent made the final installment payment during the marriage, the legal title that Fred Loos retained was far from "naked." A potential for forfeiture is in the nature of contracts for deed. If the respondent had defaulted on his obligation to make an installment payment, Fred Loos presumably could have "obtain[ed] a forfeiture," meaning that Fred Loos could have "retain[ed] all of the payments made prior to the forfeiture" and could have had the respondent "removed from the property, without any foreclosure sale or lengthy judicial process" and "with no opportunity (under the contract) to cure the default or recover any equity." *In re Brown*, 249 B.R. 193, 195 (Bankr. N.D. Ill. 2000) (citing Lisa A. Danielson, *Installment Land Contracts: The Illinois Experience and the Difficulties of Incremental Judicial Reform,* 1986 U. Ill. L. Rev. 91, 91-92, 95 (1986)); see also 77 Am. Jur. 2d Vendor and Purchaser § 59 (2022); *Reeder v. Curry*, 294 S.W.3d 851, 856 (Tex. App. 2009). "The primary attraction of the contract for deed for the vendor is the forfeiture clause." Restatement (Third) of Property (Mortgages) § 3.4 (1997).

¶ 105 The majority remarks that "[c]ontracts for deed *** come in all flavors." *Supra* ¶ 47. I would caution, however, that if the term "contract for deed" meant everything, it would

mean nothing. Also, if the respondent intended to assert that Loos Farm was his nonmarital property because after the marriage he had the same rights with respect to the farm that he had before the marriage, the burden was on him to back up that assertion with clear and convincing evidence. He acquired the legal title to Loos Farm after the marriage, and

> "there is a rebuttable presumption that all property acquired by either spouse after the date of marriage but before the entry of judgment of dissolution is marital property, regardless of how title is held. 750 ILCS 5/503(b) (West 1998). The presumption can only be overcome with a showing, by clear and convincing evidence, that the property falls within one of the statutory exceptions listed in subsection [503](a) *** [Citations.] The party claiming that the property is nonmarital has the burden of proof. [Citation.] Any doubts as to the nature of the property are resolved in favor of finding that the property is marital." (Internal quotation marks omitted.) *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (2000).

¶ 106        The record lacks a copy of the contract for deed. I see no reason for supposing that the contract for deed between Fred Loos and the respondent lacked the forfeiture provision that is the defining feature of contracts for deed. During the marriage, the respondent acquired an enhanced ownership interest in that the potential for a forfeiture went away.

¶ 107        For those reasons, then—the power of conveyance and forfeitability—I respectfully disagree with the majority's assertions that, "[o]ver 25 years, respondent's ownership interest in Loos Farm did not change, even when the contract was paid and title

given," and that "[t]he nature of what respondent owned remained the same from 1983 on." *Supra* ¶¶ 55, 56.

¶ 108                    C. Increase in Value (Section 503(a)(7))

¶ 109          The majority agrees with the circuit court on the applicability of section 503(a)(7) (750 ILCS 5/503(a)(7) (West 2020)), which defines " 'non-marital property' " to include "the increase in value of non-marital property." The majority reasons that, from the time the respondent "purchased [Loos Farm] in 1983 for $265,000" to "the time of divorce," the farm had a "400% appreciation in value" to $1,133,600. *Supra* ¶ 64.

¶ 110          My difficulty with that reasoning is twofold. First, the respondent did not purchase Loos Farm in 1983. Instead, in 1983, he began purchasing it, and he finished purchasing it during the marriage, with marital funds. Second, for the increase in value of Loos Farm to count as the respondent's nonmarital property, he would have had to own Loos Farm before the marriage. He did not own Loos Farm before the marriage. I am unconvinced that owning an equitable title to a farm under a contract for deed pursuant to which one must still make years of installment payments is the same as owning the farm.

¶ 111          Again, the respondent's equitable title to Loos Farm no doubt increased in value as he made further annual payments and as land prices went up. As I am about to explain, however, that equitable title no longer existed on the date the circuit court dissolved the marriage. In order for the court to take into account the appreciation of nonmarital property, the nonmarital property would have to still be in existence on the date of dissolution.

¶ 112                              D. Transmutation

¶ 113          As the petitioner cogently observes, (1) equitable title is a concept that has relevance only to executory contracts for the sale of land and (2) at the time the marriage was

dissolved, the respondent's contract with Fred Loos was not executory, having long ago been fully performed on both sides. The only property that the circuit court had occasion to classify was that which existed at the time the court dissolved the marriage. See *In re Marriage of Mathis*, 2012 IL 113496, ¶ 45 (Garman, J., dissenting) (reasoning that, "[i]n a bifurcated proceeding, the determination of whether a particular asset is marital or nonmarital *** necessarily utilizes the date of the judgment of dissolution as the applicable *classification* date" (as opposed to the valuation date) "because the parties cease accumulating marital property once their marriage is dissolved and each party begins accumulating separate property or remarries and begins to accumulate marital property with a new spouse" (emphasis in original)); Turner on Property § 5:28 (4th ed. 2021) (reasoning that "[t]he date of classification should ideally be set at the actual termination point of the marital partnership, so that assets which are not actual fruits of the parties' joint efforts are not included in the marital estate"). "[I]n order to be property within the ambit of the Act, the res must be in the nature of a present property interest ***." (Internal quotation marks omitted.) *In re Marriage of Centioli*, 335 Ill. App. 3d 650, 656 (2002). At the time of the dissolution of the marriage, the respondent lacked a present property interest in the form of an equitable title to Loos Farm. Absent an executory contract for the sale of land, there was no equitable title to classify as nonmarital property.

¶ 114    When the legal and equitable interests in property become vested in the same person (in this case, the respondent), the lesser estate, the equitable estate, merges into the greater estate, the legal estate (28 Am. Jur. 2d *Estates* § 374 (2022)), "resulting in the survival of only the legal estate" (31 C.J.S. *Estates* § 162 (2022)). See also *Shay v. Penrose*, 25 Ill. 2d 447, 449; *Randolph v. Wilkinson*, 294 Ill. 508, 516 (1920). "Thus, for instance, under a 'contract for deed,' the equitable title merges in the legal title when the terms of the contract for deed have

been completed and the warranty deed is entered." 28 Am. Jur. 2d *Estates* § 374 (2022). This merger results in an "extinguishment of the equitable interest." 1 Tiffany Real Property § 286 (3d ed. 2021). The respondent's equitable title to Loos Farm was extinguished during the marriage by the merger of the equitable title into the legal title. The circuit court's duty, upon dissolving the marriage, was to "assign each spouse's non-marital property to that spouse." 750 ILCS 5/503(d) (West 2020). It was impossible for the court to assign to the respondent his equitable title to Loos Farm, for that equitable title no longer existed. The only surviving property right to Loos Farm was the legal title—which the respondent acquired during the marriage.

¶ 115        As the petitioner acknowledges, this marital acquisition of legal title is not the full story. The respondent's premarital payments contributed meaningfully to the marital acquisition of Loos Farm. But so did the marital payments. "[I]n order to preserve its nonmarital status one must prove that the entire property was acquired *exclusively* by one of the methods listed in section 503(a)[ ] and that its character was not subsequently altered by action of the owner." (Emphasis added.) *In re Marriage of Smith*, 86 Ill. 2d 518, 531 (1981). The respondent did not acquire Loos Farm exclusively by making nonmarital installment payments. Rather, as the majority correctly concludes, payments with marital funds went into the mix.

¶ 116         In a case such as this one, when property from a nonmarital estate and property from the marital estate are blended into new property, we should turn to section 503(c)(1)(B) and (2)(A) for direction on how to classify the new property:

"(c) Commingled marital and non-marital property shall be treated in the following manner, unless otherwise agreed by the spouses:

(1) ***

* * *

     (B) If marital and non-marital property are commingled into newly acquired property resulting in a loss of identity of the contributing estates, the commingled property shall be deemed transmuted to marital property, subject to the provisions of paragraph (2) of this subsection (c).

     (2)(A) When one estate of property makes a contribution to another estate of property, the contributing estate shall be reimbursed from the estate receiving the contribution notwithstanding any transmutation. No such reimbursement shall be made with respect to a contribution that is not traceable by clear and convincing evidence or that was a gift." 750 ILCS 5/503(c)(1)(B), (2)(A) (West 2020).

¶ 117     The marital property, in this context, is the payments made on the contract for deed during the marriage—payments that were made with marital funds. Regardless of whether the amounts of the marital funds are, in retrospect, ascertainable, the marital funds themselves have lost their identity. In other words, it is impossible to point to a stack of currency and say, "There they are: the marital funds, in the same form and condition that they were in previously." The marital installment payments have been converted into the soil, the fenceposts, or whatever else makes up Loos Farm.

¶ 118     The same holds true for the respondent's nonmarital property that was "contributed," or "suppl[ied]" (Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/contribute (last visited on May 4, 2022)), for the acquisition of the new

property, the legal title to Loos Farm. By merging with the legal estate, the respondent's equitable estate lost its identity—indeed, was extinguished. The premarital installment payments and the marital installment payments have been commingled or blended into the newly acquired property of legal title to Loos Farm.

¶ 119    I would hold that, as a result, the legal title to Loos Farm is marital property under section 503(c)(1)(B) (750 ILCS 5/503(c)(1)(B) (West 2020)). It is hard to imagine a more perfect or more literal example of the transmutation of nonmarital property into marital property. Even if the case is not as clearcut as it looks to me, any doubt about how to classify Loos Farm should be resolved in favor of classifying the farm as marital property. See *Didier*, 318 Ill. App. 3d at 258.

¶ 120    Accordingly, I would reverse the classification of Loos Farm as the respondent's nonmarital property, I would declare the farm to be marital property, and I would remand this case to the circuit court to determine whether and to what extent the respondent is entitled to reimbursement under section 503(c)(2)(B) of the Act 750 ILCS 5/503(c)(2)(B) (West 2020)).